William L. Crowley
Natasha Prinzing Jones
Thomas J. Leonard
BOONE KARLBERG P.C.
201 West Main, Suite 300
P.O. Box 9199
Missoula, MT 59807-9199
Telephone: (406)543-6646
Facsimile: (406) 549-6804
bcrowley@boonekarlberg.com
npjones@boonekarlberg.com
tleonard@boonekarlberg.com

*Attorneys for Defendants*

Colleen E. Ambrose
Special Assistant Attorney General
Department of Corrections
5 South Last Chance Gulch
P.O. Box 201301
Helena, MT  59620
Telephone: (406) 444-4152
Facsimile: (406) 444-4920
cambrose@mt.gov

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

| | |
|---|---|
| DISABILITY RIGHTS MONTANA, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>MIKE BATISTA, in his official capacity as Director of the Montana Department of Corrections; LEROY KIRKEGAARD, in his official capacity as warden of Montana State Prison,<br><br>               Defendants. | Case No. 2:15-cv-00022-DWM<br><br>**ANSWER TO SECOND AMENDED COMPLAINT AGAINST MIKE BATISTA AND LEROY KIRKEGARD** |

Defendants answer Plaintiff's Second Amended Complaint Against Mike

Batista and Leroy Kirkegard as follows:

1

1.     Answering the allegations of Paragraph 1, Defendants admit Plaintiff

has filed a lawsuit under 42 U.S.C. § 1983 alleging violations of the Eighth

Amendment to the U.S. Constitution.  Defendants admit the action is brought on

behalf of prisoners with serious mental illness who are confined to the Montana

State Prison ("MSP").  Defendants deny Plaintiff's allegations of constitutional

violations have merit.

## THE PARTIES

2.     Defendants admit the allegations of Paragraph 2, except that Plaintiff's

associational standing is a matter of law for the Court to decide and requires no

response.  To the extent a response is required, Defendants deny the allegation.

3.     Answering the allegations of Paragraph 3, Defendants lack sufficient

knowledge or information to form a belief as to the truth of the allegations, and

therefore deny the same.

4.     Answering the allegations of Paragraph 4, Defendants deny Mike

Batista is the Director of the Montana Department of Corrections ("DOC").  The

current Director is Reginald Michael.  Defendants admit the Director administers

the policies to be followed by DOC and its employees.

5.     Answering the allegations of Paragraph 5, Defendants deny Leroy

Kirkegard is Warden of the Montana State Prison ("MSP").  The current Warden is

Lynn Guyer.  Defendants admit the MSP Warden is responsible for the immediate

management and control of the Prison, subject to the policies and programs established by the DOC.

6.      Defendants admit the allegations of Paragraph 6.

## JURISDICTION AND VENUE

7.      Defendants admit the allegations of Paragraph 7.

8.      Answering the allegations of Paragraph 8, Defendants admit venue is proper under 28 U.S.C. § 1391(b) and the rules of the Court.  Defendants deny unlawful transfers from the Montana State Hospital ("MSH") to MSP occurred.

9.      Answering the allegations of Paragraph 9, Defendants admit the Court has discretionary authority under 42 U.S.C. § 1983 to order injunctive or declaratory relief under certain circumstances.  That authority is subject to, *inter alia*, the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Defendants deny injunctive or declaratory relief is warranted in this case.

## COUNT I

### Cruel and Unusual Punishment in Violation of the Eighth Amendment to the U.S. Constitution

10.      Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

11.      Answering the allegations of Paragraph 11, Defendants admit Plaintiff is alleging Eighth Amendment violations, but deny those allegations have merit.

12.     Answering the allegations of Paragraph 12, Defendants admit the

quoted definition of "Serious Mental Illness" still remains in MSP Procedure 3.5.5,

titled "Behavior Management Plans," which was last revised in 2013.  Defendants

affirmatively state many of MSP's policies and procedures have been substantially

revised since DRM filed its Second Amended Complaint on May 8, 2015, and that

those revisions are continuing.  MSP's current written policies define "Mental

Illness" and "Severe Mental Illness (SMI)," which are the terms MSP currently

employs for purposes of the policies and procedures pertinent to this lawsuit.  The

current MSP definitions of these terms are as follows:

> Mental Illness – A mental disorder as defined in the Diagnostic and
> Statistical Manual of Mental Disorders 5th edition of the American
> Psychiatric Association, in which the person exhibits impaired
> emotional, cognitive, or behavioral functioning that interferes seriously
> with his or her ability to function adequately except with supportive
> treatment or services.  These individuals also must either currently
> have, or have had within the past year, a diagnosed mental disorder, or
> must currently exhibit significant signs and symptoms of a mental
> disorder.

> Severe Mental Illness – A primary diagnosis of any of the following
> conditions (except mild, unspecified, or due to physiological
> disturbances and physical factors) which results in recurrent
> substantial impairment in carrying out major life activities in social,
> occupational and other important daily activities, based on the
> symptom criteria, duration of the illness, and functional severity index
> listed in the most current edition of the Diagnostic and Statistical
> Manual of Mental Disorders and require assigned staff interventions to
> ensure the safety of the inmate, staff, other inmates, and overall facility
> operations.  This includes offenders previously diagnosed with such
> mental illness and the previous diagnosis has been substantiated unless

there is certification in the record that the diagnosis has been changed or altered as a result of a more recent mental health evaluation by a licensed mental health professional or symptoms of the illness are currently in remission as defined by the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders. (Schizophrenia, delusional disorder, schizophreniform, schizoaffective, bipolar I, bipolar II, major depressive disorder, panic disorder with or without agoraphobia, obsessive compulsive disorder, post-traumatic stress disorder, autism spectrum disorders, and borderline personality disorder)

*See* MSP Procedure 3.5.1, Locked Housing Operations; MSP Procedure HS E-09.0, Health Care Evaluation and Monitoring of Inmates in Locked Housing; MSP Procedure HS G-04.0, Mental Health Services; DOC Policy 3.5.1, Locked Housing Unit Operations.

Additionally, House Bill No. 763, which has been signed into law and goes into effect on January 1, 2020, contains a new definition of "mental disorder" that will apply to MSP's operations upon the effective date of the legislation.  That definition is set forth below:

'Mental disorder' means exhibiting impaired emotional, cognitive, or behavioral functioning that interferes seriously with an individual's ability to function adequately except with supporting treatment or services.  The individual also must:

(a) currently have or have had within the past year a diagnosed mental disorder; and

(b) currently exhibit significant signs and symptoms of a mental disorder.

HB 763, § 2(7).

13.     Defendants deny the allegations of Paragraph 13.  MSP has a

comprehensive and consistent method for screening and identifying prisoners with

mental illness, and for making appropriate placement, programming, and

accommodation decisions for prisoners with mental illness.

New inmates are admitted into the Martz Diagnostic Intake Unit ("MDIU")

at MSP.  Admitting staff conduct an initial health screening/assessment which

includes any history of mental illness or any history of self-harm behavior.  The

screening consists, at a minimum, of a Level 1 Screening Device, Receiving

Questionnaire, Receiving Screening, and Health Assessment.  Admitting staff must

immediately notify mental health staff of any findings or suspicions of mental

illness or thoughts of self-harm.

A Level 1 Initial Mental Health Screening is performed within 14 days of

admission.  This screening includes a structured interview with a qualified mental

health professional (psychiatrists, psychologists, psychiatric social workers,

psychiatric nurses, licensed professional counselors or others who by virtue of their

education, credentials and experience is permitted by law to evaluate and care for

the mental health needs of offenders) or mental health staff (qualified health care

professionals and others who have received special instruction and supervision in

identifying and interacting with individuals who need mental health services, e.g.,

mental health technicians).  The Level 1 screen includes a review of the inmate's

prior psychiatric hospitalization, psychotropic medication (including the name of the prescriber, if known), and outpatient treatment, current and past mental illnesses, as well as gathering releases of information from other facilities.  The screen also reviews any hospitalization due to substance abuse; suicidal behavior; violent behavior; victimization; special education placement; cerebral trauma or seizures; sex offenses; the current status of mental health symptoms and psychotropic medications; substantiated or unsubstantiated diagnoses, with or without records review; suicidal ideation; drug or alcohol use; orientation to person, place and time; emotional response to incarceration; and screening for intellectual functioning.  Each inmate with a positive screening for mental health problems is referred to a qualified mental health professional for further evaluation (i.e., a Level 2 Mental Health Evaluation).

A Level 2 Mental Health Evaluation is conducted in accordance with the urgency of the problem identified in the Level 1 screen by a qualified mental health professional, but in no case more than 30 days after admission.  The qualified mental health professional must review the mental health record, if it is available, before reviewing the inmate.  The Level 2 evaluation must include the reason for evaluation/chief complaint/current symptoms; history of present illness; risk factors such as suicidal ideation, homicidal ideation, hallucinations, history of violence, recent chemical abuse; prescribed medication, dosage, and prescribing physician;

legal history; past psychiatric history; alcohol and drug history; medical history; family medical and psychiatric history; social and developmental history; mental status exam; assessment and summary; plan of care, referrals, and information/patient instruction; and obtaining releases of information from pertinent facilities.  If an inmate comes to MSP on psychotropic medications or is asserted as having a serious mental illness or developmental disability, the mental health professional will refer him for further evaluation and/or psychological testing by the psychiatrist or psychologist as appropriate.

In the event an inmate did not require a Level 2 evaluation, as indicated by a negative Level 1 screening, and that inmate later during incarceration requires mental health evaluation and subsequent referral to a psychiatrist, a psychosocial history is completed prior to the psychiatry visit.  *See, e.g.,* MSP Procedure 4.1.1, Inmate Admissions Process; MSP Procedure 4.2.1, Inmate Classification System; MSP HS A-08.1, Housing of Inmates with Identified Mental Health Disorders; MSP HS E-05.0, Mental Health Screening and Evaluation; MSP HS G-04.0, Mental Health Services; DOC Policy 4.5.14, Offender Health Care Assessments.

14.    Defendants deny the allegations of Paragraph 14.

15.    Defendants deny the allegations of Paragraph 15.

16.     Answering the allegations of Paragraph 16, Defendants admit the former warden made the referenced statements in 2011.  Defendants deny the remaining allegations of Paragraph 16.

17.     Answering the allegations of Paragraph 17, Defendants admit it is well known in the correctional community and in the mental health treatment community that placing prisoners in locked housing for extended periods of time may be detrimental to their mental health, depending on the circumstances.  For this reason, MSP has implemented policies and procedures to screen inmates for placement in locked housing and to continually monitor and evaluate inmates in locked housing for signs of mental health decompensation.  *See, e.g.,* MSP Procedure 3.5.1, Locked Housing Operations; MSP Procedure HS A-08.1, Housing of Inmates with Identified Mental Health Disorders; MSP Procedure HS E-09.0, Mental Health Evaluation and Monitoring of Inmates in Locked Housing; MSP Procedure HS G-04.0, Mental Health Services; DOC Policy 3.5.1, Locked Housing Unit Operations.  Defendants deny the remaining allegations of Paragraph 17.

18.     Answering the allegations of Paragraph 18, Defendants admit the existence of the quoted language from National Commission on Correctional Health Care Standard ("NCCHC") MH-E-07.  Defendants deny DOC's policies or practices violate the standard.  Indeed, the standard has no application as no form of locked housing at MSP qualifies as "extreme isolation" under the NCCHC's

definition (i.e., where inmates are seen by other staff or other inmates less than

three times a day).

19.     Defendants admit the allegations of Paragraph 19.

20.     Defendants admit the allegations of Paragraph 20.

21.     Answering the allegations of Paragraph 21, Defendants admit they are

aware that certain forms of locked housing may be detrimental to the health of

prisoners with serious mental illness, depending on the circumstances, which is why

MSP has policies and procedures in place to screen inmates for placement in locked

housing and to continually monitor and evaluate inmates in locked housing for

signs of decompensation. *See, e.g.,* MSP HS A-08.1, Housing of Inmates with

Identified Mental Health Disorders; MSP HS E-09.0, Mental Health Evaluation and

Monitoring of Inmates in Locked Housing; MSP HS G-04.0, Mental Health

Services; DOC Policy 3.5.1, Locked Housing Unit Operations.  Defendants admit

they are aware of the NCCHC Standards for Mental Health Services in Correctional

Facilities.  Defendants admit they have sought (and obtained) NCCHC certification.

22.     Defendants deny the allegations of Paragraph 22.  Defendants

affirmatively state the term "locked housing" means those cells at MSP used for:

- Pre-Hearing Confinement (a short term, non-punitive housing status that is used to safely and securely control high-risk or at-risk offenders)

- Administrative Housing (a non-punitive housing status for offenders who request removal from the general population or require protection for their safety and well-being)

- Safety Management (a temporary and non-punitive separation from regular housing to establish the safety of an inmate through mental health services)

- Disciplinary Detention (a punitive confinement determined by a due process impartial hearing that separates offenders from the general population for serious rule violations)

- Special Management (inmates who are atypical and/or special needs inmates, meaning inmates who may require accommodations, arrangements, or programming different from the general population inmates)

- Maximum Custody/Administrative Segregation (inmates requiring the highest degree of control and supervision because of extreme misconduct or the nature of their sentence)

*See* MSP Procedure 3.5.1, Locked Housing Operations; DOC Policy 3.5.1, Locked Housing Unit Operations.

23.    Defendants deny the allegations of Paragraph 23.  Inmates in administrative segregation and restricted administrative segregation are allowed periods of recreation, including outdoor recreation and exercise, as well as other routine social contact among themselves and staff while segregated from the general population.  They are generally entitled to at least 1 hour of outdoor recreation and recreation, not less than five times each week.  MSP Procedure 3.5.1, Locked Housing Operations.  Additionally, HB 763 § 3(5), which will become

effective January 1, 2020, provides, in pertinent part, "[a]n inmate's placement in restrictive housing may not exceed 22 hours in a 24-hour period and is limited to circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility."

24.     Defendants deny the allegations of Paragraph 24.  Inmates in locked housing receive mental health therapy and are closely monitored by qualified mental health professionals.

A qualified mental health professional reviews an inmate's health record no later than 24 hours after placement in locked housing to determine if there are any medical or mental health contraindications or accommodations to be considered. The qualified mental health professional immediately refers inmates to mental health if it is determined that locked housing placement is contraindicated due to mental health needs.

Pursuant to MSP policy, inmates identified as having a severe mental illness should be diverted from locked housing if/when placement is available in the least restrictive environment that would also maintain the safety of the inmate, staff, other inmates, and overall facility operations.  If there are no other alternatives, an inmate with severe mental illness may not be placed in locked housing for more than 30 days.  MSP policy further states that if a mental health professional determined an inmate has a severe mental health problem, staff shall ensure the

inmate is placed in an area where necessary mental health services are available.

In locked housing, a qualified mental health professional continually monitors the mental health status of all inmates in locked housing units, including face-to-face interaction between the inmates and qualified mental health professional. Inmates in locked housing are visited by the psychiatric RN or his/her designee at least once per week. Inmates on Behavior Management Plans ("BMPs") are visited by the psychiatric RN or his/her designee at least 3 times per week. Locked housing inmates with a serious mental illness may be seen in individual therapy sessions with a licensed mental health professional as frequently as necessary, as determined by the licensed mental health professional. Moreover, all inmates in locked housing units have daily access to request mental health services. Inmates in locked housing are personally observed by staff at least once every 60 minutes on first and second shift, and every 30 minutes on third shift.

If it is a qualified mental health professional's clinical judgment, an inmate will be removed from locked housing unless written justification is provided by the prison administration.

Every locked housing inmate's classification is reviewed every 30 days, and the inmate is afforded the opportunity to be present. The review addresses, *inter alia*, the inmate's mental health issues and any concerns the inmate may have. *See* MSP Procedure 3.5.1, Locked Housing Operations; MSP HS G-04.0, Mental

Health Services; MSP HS E-09.0, Mental Health Evaluation and Monitoring of Inmates in Locked Housing; DOC Policy 3.5.1, Locked Housing Unit Operations.

25.     Defendants deny the allegations of Paragraph 25.  Inmates in administrative segregation and restricted administrative segregation are allowed periods of recreation, including outdoor recreation and exercise, as well as other routine social contact among themselves and staff while segregated from the general population.  They are generally entitled to at least 1 hour of outdoor recreation and recreation, not less than five times each week.  MSP Procedure 3.5.1, Locked Housing Operations; DOC Policy 3.5.1, Locked Housing Unit Operations. Additionally, pursuant to HB 763 § 3(5), which will become effective January 1, 2020, "[a]n inmate's placement in restrictive housing may not exceed 22 hours in a 24-hour period and is limited to circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility."

26.     Defendants deny the allegations of Paragraph 26.  Disciplinary detention is a punitive confinement determined by a due process impartial hearing that separates offenders from the general population for serious rule violations. Disciplinary detention is not "total isolation."  Inmates in disciplinary detention receive out-of-cell time, including a minimum of one hour of outdoor recreation and exercise, not less than five times each week, unless security or safety considerations dictate otherwise.  Inmates in disciplinary detention receive mental

health therapy.  Pursuant to MSP policy, conditions of confinement in locked

housing, including disciplinary detention, reflect the least restrictive amount of

control necessary to adequately supervise and safeguard inmates and staff.  Locked

housing units must be well ventilated, adequately lighted, appropriately heated, and

maintained in a sanitary condition at all times.

27.     Defendants deny the allegations of Paragraph 27.  A BMP is a strategy

to deal with, and try to end, an inmate's repeated dangerous, disruptive, and/or

assaultive conduct that is not associated with serious mental illness by taking

privileges and items the inmate has in his cell away from him and returning them in

intervals when the inmate demonstrates he can conform his conduct and be free of

dangerous and assaultive behaviors.  A BMP is only activated if mental health staff

determine the inmate's assaultive or dangerous behavior is not a direct result of an

Axis I serious mental illness; the inmate is knowingly, willingly and purposely

engaging in the assaultive and/or dangerous behaviors; a higher level of mental

health care or observation is not indicated; and the inmate's mental health status is

not presently deteriorated or deteriorating.

28.     Defendants deny the allegations of Paragraph 28.

29.     Answering the allegations of Paragraph 29, Defendants admit a BMP

clearance lasts for six months.  Clearance is given by mental health staff only after

conducting an assessment and if it is found the inmate's assaultive or dangerous

behavior is not a direct result of an Axis I serious mental illness; the inmate is knowingly, willingly and purposely engaging in the assaultive and/or dangerous behaviors; a higher level of mental health care or observation is not indicated; and the inmate's mental health status is not presently deteriorated or deteriorating.

Once on a BMP, an inmate's mental health status is continually monitored by staff.  MSP policy lists symptoms of decompensation and directs staff who witness any symptoms to immediately notify the on duty unit supervisor, who must immediately notify the Shift Commander, a mental health professional, and the Infirmary.  The responding mental health professional must immediately terminate the BMP if, *inter alia*, it is the professional's opinion that the inmate's present behavior is the direct result of an Axis I serious mental illness, the inmate needs a higher level of mental health care or observation, the inmate's mental status is presently deteriorated or deteriorating, or the inmate is exhibiting a heightened documented suicide risk.

30.    Answering the allegations of Paragraph 30, Defendants deny mental health staff fail to protect prisoners with serious mental illness from the potentially damaging effects of BMPs, or that mental health staff encourage the use of BMPs for prisoners with serious mental illness.  To the contrary, clearance is given by mental health staff only after conducting an assessment and if it is found the inmate's assaultive or dangerous behavior is not a direct result of an Axis I serious

mental illness; the inmate is knowingly, willingly and purposely engaging in the assaultive and/or dangerous behaviors; a higher level of mental health care or observation is not indicated; and the inmate's mental health status is not presently deteriorated or deteriorating.

Once on a BMP, an inmate's mental health status is continually monitored by staff. MSP policy lists symptoms of decompensation and directs staff who witness any symptoms to immediately notify the on duty unit supervisor, who must immediately notify the Shift Commander, a mental health professional, and the Infirmary. The responding mental health professional must immediately terminate the BMP if, *inter alia*, it is the professional's opinion that the inmate's present behavior is the direct result of an Axis I serious mental illness, the inmate needs a higher level of mental health care or observation, the inmate's mental status is presently deteriorated or deteriorating, or the inmate is exhibiting a heightened documented suicide risk.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 30, and therefore deny the same.

31. Defendants deny the allegations of Paragraph 31.

32. Defendants deny the allegations of Paragraph 32.

33. Defendants deny the allegations of Paragraph 33.

34. Defendants deny the allegations of Paragraph 34.

## Representative Examples of Prisoners With Serious Mental Illness Who Have Experienced Cruel and Unusual Punishment

35.     Defendants deny the allegations of Paragraph 35.  Defendants affirmatively state Plaintiff's "representative examples" concern events that occurred many years ago and are not necessarily reflective of current policies and practices at MSP and, as such, even if true do not constitute evidence of any ongoing unconstitutional conduct at MSP.  Furthermore, many of the allegations concern the psychiatric decisions of a long retired psychiatrist and are thus not relevant to any claims of deliberate indifference by a final policymaker at MSP or DOC.

### James Larson

36.     Answering the allegations in Paragraph 36, Defendants admit James Larson was sentenced Guilty But Mentally Ill ("GBMI") in 2006.  He was sentenced for three counts of felony burglary and one count of felony theft.  Mr. Larson received a 15 year sentence to the Department of Public Health and Human Services ("DPHHS") for each count to run concurrently.  Defendants admit Mr. Larson was placed at MSH, and that the presiding Judge cited, among other things, substance and mental health issues in recommending the placement.  Defendants admit Mr. Larson was diagnosed with schizophrenia and put on antipsychotic

medications.  His diagnoses also included polysubstance abuse and antisocial personality disorder.

37.     Answering the allegations of Paragraph 37, Defendants deny the allegations, except that they admit and allege as follows:

Mr. Larson was transferred from MSH to MSP after various infractions, including theft of a ring and watch from an elderly, confused female peer.  Mr. Larson was admitted to MSP (for the seventh time) on August 7, 2007.  Upon intake, Mr. Larson reported a prior diagnosis of paranoid schizophrenia.  During his time at MSP, he was treated for the alleged condition.

On October 16, 2007, Mr. Larson was sent to Crossroads Correctional Center in Shelby, Montana.  He returned to the Prison on February 12, 2008.

During the period 2008 to 2012, Mr. Larson was placed in disciplinary detention following disciplinary hearings on at least six occasions for a total of 81 days for behavior including fighting with inmates, threatening to stab, kill or injure cell mates, inmates and staff, possession of contraband, and refusing staff orders. Mr. Larson was also placed in restrictive housing for three months for observation.

Defendants admit that in November 2008, while Mr. Larson was in Closed Unit No. 1, he stated he did not "do hole time well."  He also threatened to kill unit staff, telling the unit manager: "I'll kill you all!  Bitch Sergeant!  Fuck you Shelly!" Mr. Larson was given 15 days detention until November 21, 2008.

38.     Answering the allegations in Paragraph 38, Defendants deny the allegations, except that they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses. Defendants admit the MSP psychiatrist at the pertinent time, Dr. Peter Edwards, adjusted Mr. Larson's medications on several occasions and had concerns that Mr. Larson was malingering.  More specifically, in September 2012 Mr. Larson was taking two antidepressants (Zyprexa and Risperdal).  Dr. Edwards discontinued Risperdal because Mr. Larson did not need to take two antidepressants.  In a later visit, after Mr. Larson was unable to explain any of the symptoms he was experiencing, Dr. Edwards questioned the schizophrenia diagnosis and lowered his Zyprexa dosage on December 17, 2012.  On July 17, 2013, Dr. Edwards conducted an extensive chart review and concluded that much of Mr. Larson's problems stemmed from antisocial personality disorder and malingering.  He noted that mental health staff did not observe symptoms of schizophrenia even as Mr. Larson's antipsychotic meds were tapered down.  Some months later, on December 19, 2013, Dr. Edwards discontinued Mr. Larson's prescription for Zyprexa.  In the spring of 2014, Dr. Edwards placed Mr. Larson back on a low dosage of Zyprexa.

39.     Defendants deny the allegations of Paragraph 39.  As of September 3, 2019, Mr. Larson was housed at MSH.

40.     Defendants deny the allegations of Paragraph 40.

**James Patrick**

41.     Answering the Allegations in Paragraph 41, Defendants deny such

allegations, except that they admit and allege as follows:

James Patrick was sentenced to 15 years to DPHHS for the crime of sexual

intercourse without consent.  He was admitted to MSH on June 4, 2002, and

transferred to MSP on August 8, 2007.  He has since been released.

Mr. Patrick had, at various times during his incarceration at MSP, been

placed in locked housing due to disciplinary and security issues.  Each placement

was appropriately cleared with mental health staff and his mental health was

considered in connection with each placement.  Behaviors that prompted Mr.

Patrick's placement in restrictive housing included flooding his cell, smearing feces

in his cell, refusing orders, assaulting staff and threatening to kill staff.

Mr. Patrick was assigned to the Mental Health Treatment Unit ("MHTU")

from February 2009 to May 2009.  During this period, he was placed in disciplinary

detention at least five times.  In May 2009, the Mental Health Team concluded Mr.

Patrick was using verbal threats and self-harm threats to manipulate his placement,

and their attempts to manage him in a more structured and therapeutic environment

did not benefit Mr. Patrick.  He continued to be a behavior problem and it was

noted that his problem was chronic immaturity, which is behavioral and has nothing to do with his mental illness.

42.    Answering the allegations of Paragraph 42, Defendants deny such allegations, except that they admit and allege as follows:

Mr. Patrick was placed on BMPs a number of times due to disciplinary and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement. Behaviors that prompted Mr. Patrick's placement on BMPs included swallowing 22 Prilosec pills, throwing his food tray against the cell door and refusing to clean it up, faking non-responsiveness, swallowing 30 Ibuprofen pills, feigning a seizure, refusing orders, and threatening to kill staff.

43.    Answering the allegations of Paragraph 43, Defendants deny the allegations, except that they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses. Defendants admit the MSP psychiatrist at the pertinent time, Dr. Edwards, adjusted Mr. Patrick's medications on several occasions and had concerns that Mr. Patrick was malingering.

More specifically, on March 29, 2012, Mr. Patrick was reported to have stopped taking his medication because he "got sick of taking them."  He eventually

admitted, however, that he stopped his medication due to erectile dysfunction and inability to masturbate.  Mr. Patrick agreed to a trial of new medication, Trilafon at 12 mg.

On July 25, 2012, Mr. Patrick sent a kite request for medication and visited with Dr. Edwards.  Dr. Edwards concluded that Mr. Patrick was feigning symptoms.

Mr. Patrick visited with Dr. Edwards again on January 29, 2013, and was placed on an anti-depressant.

On June 4, 2013, Mr. Patrick visited Dr. Edwards after his prescription for Celexa was discontinued due to his tearing off the label of his pill pack.  Mr. Patrick claimed that he was suffering from hallucinations due to a sudden withdrawal of Celexa.  Dr. Edwards opined he was "clearly malingering" because such withdrawal systems are not possible, and discontinued his anti-depressant.

**Shaun Morrison**

44.     Answering the allegations in Paragraph 44, Defendants admit Shaun Morrison has received diagnoses of mental illness including major depressive disorder, and that he has a history of self-harm.

45.     Defendants admit the allegations of Paragraph 45.

46.     Defendants admit the allegations of Paragraph 46.

47.     Answering the allegations of Paragraph 47, Defendants deny the allegations, except that they admit and allege as follows:

Mr. Morrison is an extremely dangerous inmate.  When housed in general population in September 2011, he targeted and brutally murdered another prisoner. Mr. Morrison has, at various times during his incarceration at MSP, been placed in restrictive housing due to disciplinary and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  Behaviors that prompted such placements included assaulting and threatening staff, damaging his cell and engaging in acts of self-harm.

48.     Answering the allegations of Paragraph 48, Defendants deny the allegations, except that they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses. Defendants admit the Prison psychiatrist at the pertinent time, Dr. Edwards, adjusted Mr. Morrison's medications on several occasions.

More specifically, on July 26, 2012, Dr. Edwards noted Mr. Morrison was diagnosed with major depression in the past, but concluded his mood instability was secondary to severe personality disorder.  Dr. Edwards prescribed Effexor to

prevent Mr. Morrison from self-mutilating, but Mr. Morrison refused to take the medication.

Later, in 2014, Dr. Edwards prescribed antidepressants upon Mr. Morrison's request, despite his misgivings that Mr. Morrison did not suffer from depression.

49.    Answering the allegations of Paragraph 49, Defendants deny such allegations, except that they admit and allege as follows:

Mr. Morrison was placed on BMPs a number of times due to disciplinary and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  BMPs resulted from a variety of behaviors, including repeatedly flooding his cell, engaging in acts of self-harm, threatening staff members and assaulting staff members (such as spitting in an officer's face and attempting to stab a nurse with a shank made out of a food tray).

50.    Answering the allegations of Paragraph 50, Defendants admit Incident Report forms indicate Mr. Morrison wanted new medication and told mental health staff "he could feel himself begin to get wound up" and "didn't want to do anything to get into trouble."  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 50, and therefore deny the same.

51.     Answering the allegations of Paragraph 51, Defendants admit Mr. Morrison, when housed in general population in September 2011, brutally murdered another prisoner.  He was found guilty of homicide and sentenced to the DOC for life without the possibility of parole.  The remaining allegations of Paragraph 51 are denied.

**Cory Weis**

52.     Answering the allegations in Paragraph 52, Defendants deny the allegations, except they admit and allege as follows:

Cory Weis was initially admitted to MSP on November 23, 2009.  On March 6, 2010, he was transferred to Great Falls Regional Prison, and later transferred to Crossroads Correctional Center.

On June 22, 2011, the district court revoked the suspended a portion of Mr. Weis's sentence, and he was sentenced to DOC for 4 years.  Defendants admit the judge recommended placement on the mental health block.

Defendants admit Mr. Weis self-reported schizophrenia and bipolar disorder upon intake at MSP.

53.     Answering the allegations in Paragraph 53, Defendants deny the allegations, except they admit and allege as follows:

Mental health staff evaluated potential placement at MHTU and determined, with Mr. Weis' agreement, that such placement would not be appropriate. With Mr. Weis' agreement, he was placed in the high security general population.

Mr. Weis had, at various times during his incarceration at MSP, been placed in restrictive housing due to disciplinary and security issues. Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.

More specifically, in February 2010, Mr. Weis stated he wanted a change in housing because he was afraid for his safety, and he wanted to be placed in Administrative Segregation. He was placed in Administrative Segregation.

54.     Answering the allegations of Paragraph 54, Defendants admit that, within weeks of arriving at MSP, Mr. Weis reported hearing voices telling him to do things to himself and threatened to kill himself. Defendants deny the remaining allegations of Paragraph 54, except they admit and allege as follows:

Mr. Weis was disciplined a number of times due to infractions. Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.

More specifically, in January 2012, Mr. Weis spent one day in a maximum security isolation cell because he expressed suicidal ideations.

In January 2012, Mr. Weis was assigned five days in disciplinary detention after pleading guilty to taking pills from another inmate.  He also received nine days disciplinary detention for refusing to go to his cell at lockdown, and eleven days disciplinary detention for flooding his cell.

In February 2010, Mr. Weis was placed in isolation for refusing to take his medications, engaging in self-harm and spreading feces on himself.  He stated he wanted a change in housing because he was afraid for his safety, and he wanted to be placed in Administrative Segregation.  He was placed in Administrative Segregation.

55.    Answering the allegations of Paragraph 55, Defendants admit Mr. Weis committed suicide on June 21, 2012, the day after high security staff began investigating allegations that Mr. Weis was forcing another inmate to perform sexual acts on him.

**Marty Hayworth**

56.    Answering the allegations of Paragraph 56, Defendants admit Marty Hayworth reported to staff that he hears the voice of a dog named Gene in his head, and that Gene directs him to harm himself, including taking his eyes out. Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations concerning Mr. Hayworth's prior diagnoses, and therefore deny the same.

28

57.    Answering the allegations in Paragraph 57, Defendants admit MSP mental health staff have questioned whether some or all of Mr. Hayworth's behaviors are behavioral, rather than having a connection to mental illness. Defendants deny the remaining allegations of Paragraph 57.

58.    Answering the allegations of Paragraph 58, Defendants deny the allegations, except they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses. Defendants admit the MSP psychiatrist at the pertinent time, Dr. Edwards, adjusted Mr. Hayworth's medications on several occasions and had concerns that Mr. Hayworth was malingering because there was no objective evidence of psychosis.

On December 3, 2012, Dr. Edwards discontinued Mr. Hayworth's medications (Seroquel and Prolixin) because he was flushing them down the toilet. In the spring of 2013, Dr. Edwards began prescribing Haldol to Mr. Hayworth to calm him and to try to curb his continued behavioral problems.  In October 2013, Dr. Edwards started Mr. Hayworth on Depakote.

Subsequently, Mr. Hayworth continued to receive disciplinary infractions, including for spreading feces on himself and his cell, refusal to return his food tray, and flooding his cell.

59.     Answering the allegations of Paragraph 58, Defendants deny the allegations, except they admit and allege as follows:

Mr. Hayworth has, at various times since 2005, been placed in restrictive housing due to repeated disciplinary infractions and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  In restrictive housing, he continued to spread feces in his cell and engage in self harm, among other behaviors.

60.     Answering the allegations of Paragraph 60, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore deny the same.

**Paul Parker**

61.     Answering the allegations of Paragraph 61, Defendants admit Paul Parker has carried diagnoses of mental illness, including bipolar disorder, antisocial personality disorder and borderline personality traits or disorder.  Defendants admit Mr. Parker has taken lithium for bi-polar disorder, and has taken antidepressants and antipsychotic medications.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 61, and therefore deny the same.

62.     Answering the allegations of Paragraph 62, Defendants deny the allegations, except they admit and allege as follows:

Mr. Parker has, at various times during his incarceration at MSP, been placed in restrictive housing due to disciplinary infractions and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  Defendants admit Mr. Parker has expressed concern about being housed in the general prison population and being housed in restrictive housing.

63.     Answering the allegations of Paragraph 63, Defendants deny the allegations, except they admit and allege as follows:

Mr. Parker has, at various times during his incarceration at MSP, been placed on BMPs due to disciplinary infractions and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  Behaviors prompting these placements included failure to obey orders, threats of self harm, damaging his cell, and threats toward staff.

64.     Answering the allegations of Paragraph 64, Defendants deny mental health staff refused to acknowledge the existence of Mr. Parker's mental illness. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 64, and therefore deny the same.

65.    Answering the allegations of Paragraph 65, Defendants deny MSP staff have been deliberately indifferent.  Defendants admit a Locked Housing Inmate Management Plan was completed for Mr. Parker with a Classification Date of December 6, 2011, and the document listed goals for Mr. Parker's locked housing stay.  One goal was, in part, to "learn to deal with depression and complete the New Freedom Depression Binder."  The document also noted his "extensive history of threatening other inmates and staff" and set a goal for Mr. Parker to "learn to refrain from this type of behavior by working on his 'people skills' and thinking before he reacts."  The document stated Mr. Parker "needs to occupy his mind and needs to work on completing his GED.  It is recommended he sign up for School Cell Study while in Locked Housing and work on obtaining his GED."

66.    Answering the allegations of Paragraph 67, Defendants admit they rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses.  Defendants admit the MSP psychiatrist at the pertinent time, Dr. Edwards, made the referenced statement in a psychiatry record.

67.    Answering the allegations of Paragraph 67, Defendants deny the allegations, except they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses.

Defendants admit the MSP psychiatrist at the pertinent time, Dr. Edwards, adjusted Mr. Parker's medications.  Dr. Edwards discontinued Mr. Parker's Lithium prescription and prescribed Paxil instead.  Dr. Edwards reasoned Mr. Parker had too much suicide potential to be placed on Lithium.

**Walter Taylor**

68.     Answering the allegations of Paragraph 68, Defendants admit Walter Taylor is an elderly male who has carried various diagnoses of mental illnesses, including anti-social and borderline personality disorders.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 68, and therefore deny the same.

69.     Answering the allegations of Paragraph 60, Defendants admit Mr. Taylor has engaged in acts of self-mutilation on numerous occasions, including the forms of self-mutilation referenced in Paragraph 60.  Defendants admit Mr. Taylor's 1999 Parole Review Report indicated he had undergone 32 stomach surgeries to remove hazardous items.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 69, and therefore deny the same.

70.     Answering the allegations of Paragraph 70, Defendants deny the allegations, except they admit and allege as follows:

Mr. Taylor has, at various times during his incarceration at MSP, been placed in restrictive housing and on BMPs due to disciplinary infractions and security issues.  Each placement was appropriately cleared with mental health staff and his mental health was considered in connection with each placement.  Behaviors prompting these placements included threats and acts of self-harm.

71.     Defendants deny the allegations of Paragraph 71.

72.     Answering the allegations of Paragraph 72, Defendants deny the allegations, except they admit and allege as follows:

Defendants rely on the advice of appropriately licensed medical professionals to make clinical judgments regarding medications and mental illness diagnoses. Defendants admit the MSP psychiatrist at the pertinent time, Dr. Edwards, adjusted Mr. Taylor's medications.

More specifically, on January 9, 2013, Mr. Taylor stated he did not want to walk to high support to get his medications and that the doctor could discontinue them.  Mr. Taylor had a follow-up visit with Dr. Edwards after going off all of his medications, including Prozac, Seroquel, Lithium and Propranolol.  Dr. Edwards started Mr. Taylor on Prozac.  On March 26, 2013, Dr. Edwards placed Mr. Taylor on Risperdal to avert him from engaging in self-harm behaviors.  On June 4, 2013, after Mr. Taylor had stopped taking Prozac and Risperdal, he sent a written request to go back on Prozac, which Dr. Edwards approved.  Later, on December 12, 2013,

Dr. Edwards prescribed Effexor to Mr. Taylor.  Subsequent records indicate Mr. Taylor had no complaints regarding his medication regimen.

73.     Answering the allegations of Paragraph 73, Defendants admit Mr. Taylor swallowed paperclips in 2013 but deny the remaining allegations.

74.     Answering the allegations of Paragraph 74, Defendants admit Mr. Taylor was denied parole in August 2013.  Defendants allege that on June 17, 2013, Mr. Taylor stated he did not want to be released on parole.  Mr. Taylor has stated in the past he cannot make it "outside" and prefers to be in prison.  The unit manager filed a parole report stating a release is not supported without an extensive mental health component and updated positive psychological report.

**Cleveland Boyer**

75.     Answering the allegations of Paragraph 75, Defendants admit Cleveland Boyer was admitted to MSP on February 4, 2013, and was 23 years old at the time.  Defendants admit Mr. Boyer had previously been at the Yellowstone County Detention Facility ("YCDF") and had previously been diagnosed with anxiety and depression.  Mr. Boyer's intake screening indicated he abused drugs. His medications at the time of screening included Zoloft, Prozac, Buspar, Doxepin and Gabapentin.  He did not pass the intake drug test and was cited for the infraction.  Defendants deny the remaining allegations of Paragraph 75.

76.     Answering the allegations of Paragraph 76, Defendants admit it was reported that Mr. Boyer attempted to commit suicide at YCDF the day after his mother passed away by attempting to slit his throat.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 76, and therefore deny the same.

77.     Answering the allegations of Paragraph 77, Defendants deny MSP mental health staff disregarded or trivialized Mr. Boyer's mental health needs. Defendants admit the remaining allegations of Paragraph 77.

78.     Answering the allegations of Paragraph 78, Defendants admit the quoted language is contained in the records of the MSP psychiatrist at the time, Dr. Edwards.  The records speak for themselves.  Defendants deny the remaining allegations of Paragraph 78.

79.     Answering the allegations of Paragraph 79, Defendants admit Mr. Boyer was placed in Administrative Segregation after staff found razor blades and marijuana in his cell.  Defendants admit that during his stay in Administrative Segregation, on June 26, 2013, he met Dr. Edwards.  Mr. Boyer completed his stay in Administrative Segregation without incident and was placed in close custody on August 14, 2013.  On August 23, 2013, he was found deceased in his cell. Defendants deny the remaining allegations of Paragraph 79.  Defendants lack

sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 79, and therefore deny the same.

**Matthew Brandemihl**

80.     Answering the allegations of Paragraph 80, Defendants admit Matthew Brandemihl was 32 years old when he was transferred from Gallatin County Jail on or about May 12, 2014 to MSP.  Mr. Brandemihl was serving probation violation sentences for Criminal Endangerment, 8 years, and Theft, 8 years.  He had no past psychiatric history.  Defendants admit that an incident report from the Gallatin County Jail, dated May 5, 2014, indicates Mr. Brandemihl bit his left arm, causing a wound approximately 2 inches in diameter.  The report indicates Mr. Brandemihl stated, *inter alia*, he was the son of God and has been alive for over one thousand years, and that his brother was the devil and becomes a spirit that possesses other people's bodies in order to torment him, and tells him to commit acts of destruction. Defendants admit an MSP nursing record dated May 12, 2014, states that Mr. Brandemihl arrived with a "significant self-inflicted bite wound on his hand," and "was seen for mental health intake assessment immediately but presents to medical as emotionally sad."  After the intake screening, a more comprehensive mental health assessment (Level 2) was ordered and completed on May 20, 2014.  A subsequent psychiatric evaluation was conducted by Dr. Edwards on June 30, 2014. Mr. Brandemihl received extensive mental health services at MSP, including bi-

weekly visits to mental health.  Defendants deny the remaining allegations of

Paragraph 80.

81.     Answering the allegations of Paragraph 81, Defendants lack sufficient

knowledge or information to form a belief as to the truth of the allegations, and

therefore deny the same.

82.     Answering the allegations of Paragraph 82, Defendants admit that,

during a Level 2 Clinical Intake Assessment on or about May 20, 2014, Mr.

Brandemihl stated "a devise has been drilled into, or implanted into my head, and I

would like to have it taken out."  Mr. Brandemihl further stated he had no mental

health problems, he did not want to see a psychiatrist, and did not want any

psychiatric medications.  The nurse who conducted the assessment recommended

weekly wellness checks.  Defendants lack sufficient knowledge or information to

form a belief as to the truth of the remaining allegations of Paragraph 82, and

therefore deny the same.

83.     Answering the allegations of Paragraph 83, Defendants admit

correctional officers responded to an incident in the infirmary on June 20, 2014, in

which Mr. Brandemihl was shouting, among other things, that he was "the son of

god Jesus Christ and you can't keep me here I am fucking leaving."  Mr.

Brandemihl refused numerous orders to cuff up and was ultimately cuffed by force.

After being assessed by medical staff in the infirmary, he was escorted back to

locked housing and seen by mental health staff for evaluation.  Defendants admit an

investigator concluded his behavior was "not symptomatic of a mental illness that

would prevent knowledge of his actions."  Defendants deny the remaining

allegations of Paragraph 83.

84.     Answering the allegations of Paragraph 84, Defendants admit that on

June 30, 2014, the MSP psychiatrist at the time, Dr. Edwards, completed a

Psychiatric Evaluation for Mr. Brandemihl wherein he stated, in part, that "the

longer the conversation went on with this man the more suspicious I got of just

frank malingering and being uncooperative."  Dr. Edwards noted Mr. Brandemihl

had no prior mental health history but was requesting a transfer to MSH.  Dr.

Edwards noted significant substance abuse history including "opiates, alcohol daily,

cocaine, cannabis, and amphetamine."  Defendants admit Dr. Edwards made no

recommendations for treatment or medication at the time of the Psychiatric

Evaluation.

85.     Answering the allegations of Paragraph 85, Defendants admit that Mr.

Brandemihl was referred for urgent mental health services on July 2, 2014, when

staff found sores on his arms from biting himself.  An Emergency Mental Health

Evaluation, Suicide Risk Assessment, and Treatment Plan was completed by an

MSP therapist.  He was placed on 24-hour monitoring in the infirmary by Dr.

Kohut for medical status and continued visits and monitoring by mental health staff.

The following day, when staff went to take him back to the infirmary to change his bandages, it was discovered he had ripped them off.  Mr. Brandemihl then refused to comply with staff orders and was written up for a disciplinary infraction for refusing to obey a direct order, engaging in self-harm, and obstructing, hindering, and impeding staff.

86.     Answering the allegations of Paragraph 86, Defendants admit that on July 18, 2014, staff responded to Mr. Brandemihl's cell due to excessive noise and found Mr. Brandemihl sitting on the ground and drinking water out of his toilet with his cup.  He refused to come to the door and cuff up.  His cellmate then told staff he had gotten off his top bunk and fell and hit his head on the toilet.  His cellmate reported he had taken approximately 50 multivitamins.  Mr. Brandemihl was cared for and medically assessed by the nurses and then transported to the infirmary to be treated and stabilized.  In the infirmary, nurses observed an actively bleeding wound on Mr. Brandemihl's left forearm.  Tissues with fresh blood and signs of old dried blood were found in his cell.  A request to initiate a BMP was made by the unit manager where Mr. Brandemihl was housed "as a means to reduce any further self-harm behavior" and was approved by mental health staff. Defendants admit mental health staff determined Mr. Brandemihl met the criteria for a BMP, which includes that "the inmate [is] knowingly, willingly, and purposely engaging in dangerous behavior."

87.     Answering the allegations of Paragraph 87, Defendants admit medical records from Deer Lodge Hospital speak for themselves.

88.     Answering the allegations of Paragraph 88, Defendants admit Mr. Brandemihl was written up for disciplinary infractions including obstructing and hindering staff and engaging in self-harm.  Defendants admit Mr. Brandemihl remained in locked housing.  Defendants deny the remaining allegations of Paragraph 88.

89.     Answering the allegations of Paragraph 89, Defendants admit Dr. Piranian requested an "ASAP" assessment of Mr. Brandemihl on August 4, 2014, due to "apparent persecutory delusions."  Mr. Brandemihl was immediately seen by mental health staff upon receipt of Dr. Piranian's request the following day.  He was first seen by Mental Health Technician Derick Budd.  Mr. Brandemihl reported to Budd that he was doing fine and was not having any problems.  His affect appeared to be happy.  He expressly denied any homicidal or suicidal ideation.  The information was related to the on-call therapist.  That same day, he was seen later by another Mental Health Technician for a wellness check.  Defendants deny the remaining allegations of Paragraph 89.

90.     Answering the allegations of Paragraph 90, Defendants admit that on September 23, 2014, Mr. Brandemihl was found sleeping in his cell near a plastic bag that appeared to have traces of blood in it.  Defendants admit he refused to be

handcuffed when directed by the corrections officers, and instead began flushing objects down the toilet in his cell.  Mr. Brandemihl was taken to the Infirmary for evaluation.  His cell was cleaned and contraband removed.  At approximately 10:30 a.m., he was seen by MSP Clinical Supervisor Katherine Flynn, Psy.D, who reported he was "very calm, pleasant, and behaved appropriately to this writer." She noted there were "no vegetative signs of depression," and that Mr. Brandemihl "denied current self-harm thoughts, intent or plan."  Additionally, "[h]e verbally agreed to contact unit staff if he has an urge or thoughts of self-harm."  Defendants deny the remaining allegations of Paragraph 90.

91.     Answering the allegations of Paragraph 91, Defendants admit that, on September 24, 2014, Mr. Brandemihl was found dead in his cell at approximately 7:05 a.m. in a high security housing unit.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 91, and therefore deny the same.

92.     Answering the allegations of Paragraph 92, Defendants deny MSP's treatment and care of prisoners with serious mental illness violates constitutional requirements, and further deny they were aware of any constitutional deficiency. Defendants deny *Walker v. State*, 68 P.3d 872 (Mont. 2003), concluded that BMPs and other conditions violated the U.S. Constitution.  Defendants allege the monitors appointed by the Montana Supreme Court were supportive of MSP's use of BMPs.

93.    Answering the allegations of Paragraph 92, Defendants admit the allegations in the first two sentences, but deny the allegations in the third and final sentence.

94.    Answering the allegations in Paragraph 94, Defendants admit that prisoners may, and do, grieve conditions of confinement, including conditions relating to mental health treatment and housing.  Defendants admit some prisoners have appealed grievances relating to mental health treatment to the Warden and Director.  As it relates to a staff member's alleged statements in 2012, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations, and therefore deny the same.  Defendants deny the remaining allegations of Paragraph 94.

95.    Answering the allegations in Paragraph 95, Defendants admit Plaintiff's representatives have expressed opinions that the treatment of prisoners with serious mental illness is deficient at MSP.  Defendants deny the treatment is deficient, much less unconstitutional.

96.    Answering the allegations of Paragraph 96, Defendants admit the allegations in the first sentence and deny the allegations in the second sentence.

97.    Defendants deny the allegations of Paragraph 97

98.    Defendants deny the allegations in Plaintiff's Prayer for Relief

99.     Defendants deny any allegations not specifically admitted or otherwise addressed above.

## AFFIRMATIVE DEFENSES

1.      No policy, custom or practice of the DOC or MSP caused or is causing a violation of the federal constitutional rights of Plaintiff's members.

2.      No authorized policymaker of the DOC or MSP acted or is acting with deliberate indifference to a serious mental health or other health need of Plaintiff's members.

3.      The policies, customs and practices of the DOC and MSP serve legitimate penological interests.

4.      Plaintiff's claims for equitable relief, request for attorney's fees, litigation expenses and costs are subject to the requirements and limitations of the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

5.      Plaintiff's members are not subject to irreparable injury.

6.      The relief sought by Plaintiff's members is, in part, prohibited by the Eleventh Amendment.

7.      Plaintiff's claims for relief are moot, in whole or in part.

WHEREFORE, having fully answered Plaintiff's Second Amended Complaint Against Defendants Mike Batista and Leroy Kirkegard, Defendants request judgment as follows:

1.      For a dismissal of each of the claims against Defendants on their

merits;

2.      For an award of lawful costs of suit expended; and

3.      For such other and further relief as is just and equitable.

DATED this 10th day of September, 2019.


/s/ Thomas J. Leonard
Thomas J. Leonard
BOONE KARLBERG P.C.
*Attorneys for Defendants*