Alex Rate
ACLU of Montana
P.O. Box 1968
Missoula, MT 59806
Telephone: (406) 204-0287
Email: ratea@aclumontana.org

Jeffrey A. Simmons
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703-1482
Telephone: (608) 258-4267
Email: jsimmons@foley.com

Kyle A. Gray
Holland & Hart LLP
401 N. 31st Street, Suite 1500
Billings, MT 59101-1277
Telephone: (406) 252-2166
Email: kgray@hollandandhart.com

Roberta Zenker
Disability Rights Montana, Inc.
1022 Chestnut Street
Helena, MT 59601-0820
Telephone: (406) 449-2344
Email: roberta@disabilityrightsmt.org

*Attorneys for Plaintiff Disability Rights Montana, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | | |
|---|---|---|
| DISABILITY RIGHTS MONTANA, INC., on behalf of all prisoners with serious mental illness confined to the Montana State Prison, <br><br> Plaintiff, <br><br> vs. <br><br> REGINALD MICHAEL, in his official capacity as Director of the Montana Department of Corrections; LYNN GUYER, in his official capacity as warden of Montana State Prison, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2-15-cv-00022-DWM <br><br><br><br><br> **AMENDED COMPLAINT** |

For its Amended Complaint in this action, plaintiff Disability Rights Montana, Inc. ("DRM") alleges as follows:

1.      This is an action brought on behalf of all prisoners with serious mental illness who are confined to the Montana State Prison ("State Prison" or "Prison"). DRM brings claims on behalf of these prisoners pursuant to 42 U.S.C. § 1983 for ongoing violations of their constitutional right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

## THE PARTIES

2.      Plaintiff DRM is a not-for-profit Montana corporation and the authorized protection and advocacy agency for Montana pursuant to the federal Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 et seq.  Among other things, DRM is authorized by federal law to pursue legal remedies to ensure that individuals with serious mental illness in state institutions are protected from abuse and neglect.  Because prisoners with serious mental illness are DRM's constituents, DRM has associational standing to bring claims on behalf of prisoners with serious mental illness as alleged in this lawsuit.

3.      Individuals who have received or are receiving mental health services, or their family members, are substantially involved in DRM's governance, including serving on DRM's board of directors.  DRM's board of directors is comprised of eight members, two of whom either have received or are receiving

2

mental health services, and three of whom have family members who have received or are receiving mental health services. DRM's advisory council has eight members, seven of whom either have received or are receiving mental health services and one of whom has a family member who has received or is receiving mental health services.

4. Defendant Reginald Michael is Director of the Montana Department of Corrections ("DOC") and is sued in his official capacity. At all times relevant to this Amended Complaint, Director Michael was acting within the scope of his employment and under color of state law in his capacity as Director of DOC. Director Michael is directly responsible for the administration of the Prison and has authority to direct the housing, discipline, treatment and care of prisoners with serious mental illness at the Prison. In his official capacity, Director Michael is responsible for administering the policies and practices at issue with respect to the claims against him and has the authority to implement the relief sought in this action.

5. Defendant Lynn Guyer is Warden of the State Prison and is sued in his official capacity. At all times relevant to this Amended Complaint Warden Guyer was acting within the scope of his employment and under color of state law in his capacity as Warden. Warden Guyer is directly responsible for the administration of the Prison and has authority to direct the housing, discipline,

treatment and care of prisoners with serious mental illness at the Prison.  In his official capacity, Warden Guyer is responsible for administering the policies and practices at issue with respect to the claims against him and has the authority to implement the relief sought in this action.

6.      Director Leonard and Warden Guyer are referred to collectively as the "DOC Defendants."

## JURISDICTION AND VENUE

7.      This court has jurisdiction over DRM's claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and is proper in this Division pursuant to Local Rule 3.2(b), *inter alia*, because the unlawful transfers from the Montana State Hospital that were part of this action as originally filed, occurred in Deer Lodge County.

9.      This Court has authority pursuant to 42 U.S.C. § 1983 to order injunctive and declaratory relief.

## COUNT I

### Cruel and Usual Punishment in Violation of the Eighth Amendment to the U.S. Constitution

10.      DRM incorporates the allegations of paragraphs 1 - 9 as if fully restated here.

4824-7270-6479.1

11.     DRM alleges that the DOC Defendants have subjected, and are continuing to subject, prisoners with serious mental illness to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

12.     "Serious mental illness" is a term that is widely used by mental health professionals and includes a variety of mental illnesses that can have a serious adverse impact on a person's mental health, physical health, and ability to perform daily life functions.

13.     Serious mental illnesses include the following mental illnesses recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed.) ("DSM-5"):  schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, substance/medication-induced, psychotic disorder, major depressive disorders, and bi-polar disorder.

14.     Serious mental illness can also include other DSM-5 disorders that are commonly characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.  An example is severe personality disorder that involves acts of self-harm.

15.     Serious mental illness can also include an intellectual disability, dementia, traumatic brain injury, or other cognitive disorder that results in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

16.     Under any legitimate definition of "serious mental illness," the DOC Defendants are subjecting prisoners with serious mental illness to cruel and unusual punishment by engaging in at least the following practices:

    a.    placing prisoners with serious mental illness in various forms of solitary confinement for 22 to 24 hours per day for months and years at a time;

    b.    placing prisoners with serious mental illness on behavior management plans that involve solitary confinement and extreme restrictions of privileges;

    c.    having no standards for determining whether placing a prisoner with serious mental illness in solitary confinement or on a behavior management plan will be harmful to the prisoner's mental health;

    d.    engaging in a pattern of refusing to properly diagnose prisoners as suffering from serious mental illness;

6

e.      failing to have a system in place to review and evaluate the

diagnosing and prescribing practices of its mental health staff;

f.      failing to have a system to classify prisoners according to their

mental health needs;

g.      failing to adequately consider prisoners' serious mental

illnesses when making decisions about prisoners' housing and

custody levels; and

h.      having no system in place for auditing, evaluating or ensuring

the effectiveness of its mental health care program in treating

prisoners with serious mental illness.

17.    In 2011, the Prison Warden estimated that approximately one-fifth of the Prison's approximately 1,500 prisoners have a mental illness.

18.    It is well known in the correctional community and in the mental health treatment community that subjecting prisoners to extended periods of solitary confinement is detrimental to their mental health.

19.    For example, in 2016 the National Commission on Correctional Health Care issued a position statement declaring:  "It is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement. . . .  [M]entally ill individuals . . . should be excluded from solitary confinement of any duration."

7

20.     In 2013, the American College of Correctional Physicians adopted a position statement regarding restricted housing of mentally ill inmates that states: "[P]rolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment.  Inmates who are seriously mentally ill should be either excluded from prolonged segregation status (*i.e.*, beyond 4 weeks) or the conditions of their confinement should be modified in a manner that allows for adequate out-of-cell structured therapeutic activities and adequate time in an appropriately designed outdoor exercise area."

21.     The American Psychological Association has published a statement declaring:  "Solitary confinement is associated with severe harm to physical and mental health among both youth and adults, including:  increased risk of self-mutilation and suicidal ideation; greater anxiety, depression, sleep disturbances, paranoia, and aggression; exacerbation of the onset of pre-existing mental illness and trauma symptoms; [and] increased risk of cardiovascular problems."

22.     In March 2015, United States Supreme Court Justice Anthony Kennedy, in testimony before the House Appropriations Subcommittee on Financial Services and General Government, said "Solitary confinement literally drives men mad."

23.     The DOC Defendants are aware of the fact that solitary confinement is detrimental to the health of prisoners with serious mental illness.  In particular,

8

the DOC Defendants are aware of the National Commission on Correctional

Health Care's position statement, because the DOC Defendants have sought

certification from that organization.

24.    The State Prison uses at least four general forms of solitary

confinement to punish prisoners with mental illness:  administrative segregation,

restricted administrative segregation, disciplinary detention, and behavior

modification plans.  All of the forms of solitary confinement involve subjecting the

prisoner to being locked in his cell alone for 22 to 24 hours a day, seven days a

week.  The DOC Defendants refer to these forms of solitary confinement as

"Locked Housing."

25.    In the least restrictive form of administrative segregation, prisoners

are isolated in their cells at least 22 hours a day, five days a week, and 24 hours a

day, two days a week.  The out-of-cell time for prisoners in the least restrictive

forms of administrative segregation consists of one hour per day alone in a

dayroom adjoining his cell, and one hour per day in a small outdoor caged area by

himself.  If there is inclement weather, the one hour of outdoor recreation may be

cancelled.  If a prisoner is not feeling well or does not wake up during the

designated one-hour outdoor recreation period, which is often the case for

prisoners with serious mental illness, the prisoner may not receive his one hour of

outdoor time.

26.     The primary contact that prisoners with serious mental illness have with mental health staff while they are in solitary confinement consists of weekly rounds by mental health technicians.  Each visit during weekly rounds typically lasts no more than a few minutes and is conducted at the prisoner's cell door, where other prisoners and corrections officers can hear what is said.  As a result, prisoners with serious mental illness are often reluctant to share their mental health concerns during those rounds.  The futility of this process causes prisoners with serious mental illness to suffer additional stress.

27.     In more restrictive forms of administrative segregation and in restricted administrative segregation, prisoners are locked in their cells at least 23 hours per day, five days a week, and 24 hours a day, two days a week.  Prisoners in these forms of solitary confinement receive one hour of outdoor recreation time five days a week.  Again, if the prisoner is not feeling well or is asleep, or if there is inclement weather, the prisoner may not receive the one hour of outdoor recreation time.

28.     Disciplinary detention is among the most extreme forms of solitary confinement imposed at the Prison.  Disciplinary detention is referred to by prisoners and Prison staff as "The Hole."  The Hole is total isolation.  Prisoners sent to The Hole are subjected to 24-hour isolation in their cell.  Some cells used for The Hole have blacked-out windows, resulting in a total absence of natural

10

light.  Prisoners placed in The Hole cannot make phone calls or have visitors.

They cannot participate in religious services or rehabilitative treatment programs.

They receive no mental health therapy.  They receive no indoor or outdoor

recreation time whatsoever.  The only out-of-cell time given to prisoners in The

Hole consists of three, ten-minute showers per week.

29.     Behavior management plans are a form of punishment that involves a

combination of solitary confinement and extreme reduction in privileges.  Under a

behavior management plan, a prisoner is kept in 24-hour isolation.  A prisoner on a

behavior management plan starts out by having all of his prison clothing removed

and being given just a mattress, blanket, and a suicide smock.  At the start of a

behavior management plan, all meals consist of a tasteless loaf of food

("nutraloaf") delivered on a paper towel, and the prisoner is not allowed any

running water in his cell.  A guard must flush the toilet for the prisoner, and the

prisoner must ask for water to wash his hands.  In extreme forms of behavior

management plans, prisoners must go to the bathroom through a grate on the floor.

30.     Staff at the Prison have placed individual prisoners with serious

mental illness on behavior management plans numerous times, without modifying

the behavior management plan to account for the prisoner's mental illness or the

failure of previous behavior management plans to alter the prisoner's behavior.

31.     Although the Prison's formal policies call for Prison mental health staff to certify that "[t]he inmate's present behavior is not the direct result of an Axis I serious mental disorder" before placing a prisoner on a behavior management plan, the DOC and the Prison have no standards to guide mental health staff in making that determination and do not require mental health staff to document the factual bases for their decisions.  Under the Prison's policies, Prison mental health staff certify prisoners in advance to be subjected to behavior management plan at any time during the following six months.

32.     Rather than protect prisoners with serious mental illness from the damaging effects of behavior management plans, mental health staff sometimes encourage the use of behavior management plans for such prisoners.  In one instance, a Prison mental health staff person wrote to Prison staff that two individuals sentenced Guilty But Mentally Ill would be "good candidates" for behavior management plans at the Prison.

33.     The Prison regularly places prisoners with serious mental illness in all of the forms of solitary confinement described above for weeks and months at a time.  Some prisoners with serious mental illness have spent years in various forms of solitary confinement during their time at the Prison.

34.     Prisoners with serious mental illness at the Prison receive little, if any, meaningful interaction with mental health clinicians.  The Prison offers group

12

therapy with mental health staff to only a very small percentage of the prisoners with serious mental illness, none of whom are in solitary confinement.  An even smaller percentage of prisoners with serious mental illness receive individual therapy at the Prison.

## Representative Examples of Prisoners With Serious Mental Illness Who Have Experienced Cruel and Unusual Punishment

35.     Below are examples of the experiences of eight current and former prisoners who suffer from serious mental illness and were subjected to solitary confinement and improper mental health care at the Prison.  The examples demonstrate an ongoing pattern of behavior at the Prison indicating that numerous prisoners with serious mental illness – not just the eight identified below – have been subjected to cruel and unusual punishment and that all prisoners with serious mental illness at the Prison are at significant risk for suffering cruel and unusual punishment in the future.

## James Patrick

36.     In 2002, a district court judge found James Patrick Guilty But Mentally Ill.  In 2007, the Montana Department of Public Health and Human Services transferred Mr. Patrick to the State Prison.  At the Prison, Mr. Patrick spent over three years in solitary confinement for "bizarre" and "disruptive" behavior.  For two months, Mr. Patrick was placed in the Prison's Mental Health Treatment Unit where, despite his previous diagnoses of serious mental illness,

13

Prison mental health staff concluded that his problems were behavioral and stemmed from immaturity and other unknown sources.  As a result, Prison staff transferred Mr. Patrick back to solitary confinement.

37.    Prison staff continuously refused to consider Mr. Patrick's mental illness when addressing his behavior.  Prison staff placed Mr. Patrick on behavior management plans approximately 25 times for acts including actual and threatened self-harm, smearing feces in his cell, banging his head until it bled on his cell door while asking for real food instead of nutraloaf, crying and saying people on the floor were talking to him, attempting suicide, cutting himself with a broken deodorant stick, and hitting his cell door and screaming "help me help me" for 20 minutes.  Mr. Patrick spent weeks in 24-hour isolation in disciplinary detention for similar behaviors.

38.    In 2012, Prison mental health staff discontinued Mr. Patrick's antipsychotic medications, which he had taken for many years, after he temporarily refused to take them.  Mr. Patrick's subsequent requests for medications were denied.  While unmedicated, Mr. Patrick was found guilty of multiple rule violations for bizarre behavior and self-harm and was subjected to behavior management plans, disciplinary detention and administrative segregation.

4824-7270-6479.1

**Shaun Morrison**

39.     Shaun Morrison has received diagnoses of serious mental illness throughout his life, including major depressive disorder.  He also has a long history of extreme self-harm.  He has cut himself on numerous occasions, resulting in hospitalizations and near loss of life due to blood loss.  In addition to cutting himself, he has also bitten through his own skin, ripped stitches, and reopened wounds with foreign objects.

40.     In 2006, Mr. Morrison was sentenced Guilty But Mentally Ill.  That same year, the Montana Department of Public Health and Human Services transferred him to the State Prison.

41.      While at the Prison, Mr. Morrison spent two months in the Mental Health Treatment Unit.  During that time, he filled out a "treatment planning worksheet," in which he listed the following ways Prison mental health staff could help him:  "Be there to talk to me when I'm having problems.  Groups with homework.  Give me stuff to do so I can keep myself and my mind busy."

42.     Instead, Prison staff transferred him to solitary confinement because the Mental Health Treatment Unit could not manage his self-harm behavior.  Despite his Guilty But Mentally Ill sentence and previous diagnoses of mental illness, Prison staff said that Mr. Morrison had "no mental health history that would preclude an ad seg placement."

43.     At one point, Prison mental health staff discontinued Mr. Morrison's medications, based on the staff's conclusion that "he appears to do as well/poorly, whether on or off Rx."

44.     The Prison's most common response to Mr. Morrison's acts of self-harm has been to place him on a behavior management plan.  He has spent significant periods of time on behavior management plans in 24-hour isolation, often in a padded cell.  The longer he spent in solitary confinement and on behavior management plans, the worse his self-harm episodes became.

45.     In July 2011, Mr. Morrison stated to Prison mental health staff that he had "been in locked housing for way too long" and was "wound up," "stressed," and worried about doing "something stupid" that would get him into trouble.

46.     Upon being moved out of solitary confinement, in September 2011, Mr. Morrison murdered another prisoner.  Mr. Morrison was found guilty of homicide and sentenced to the DOC for life without the possibility of parole.

47.     Since his life sentence, Mr. Morrison has been housed in solitary confinement almost continuously.  Mr. Morrison was transferred to another facility in November 2016, but was returned to the Prison in February 2017 due to self-harm behaviors.

48.     The Prison continues to impose behavior management plans in response to Mr. Morrison's acts of self-harm.

16

49.     Mr. Morrison was on a behavior management plan from February to

August of 2019 after he swallowed several metal objects in an attempt at self-

harm.

50.     The Prison continues to classify Mr. Morrison's self-harm as

"knowing[ ], willing[ ], and purposeful[ ]," "manipulative," and not the result of a

mental health diagnosis.

**Cory Weis**

51.     Cory Weis was diagnosed with bipolar disorder and schizophrenia and

received various medications for those illnesses before arriving at the Prison.

When the Judge sentenced him to the Prison, she recognized Mr. Weis's mental

health issues and "highly recommend[ed] that he be considered for placement in

the mental health block at the Prison because that seems to me that that's going to

be the best place for [him]."

52.     Despite the Judge's express recommendation, Mr. Weis was never

placed in the Mental Health Treatment Unit at the Prison.  Prison records suggest

that Mr. Weis spent more than half of his time at the Prison in solitary

confinement.  The Prison's mental health staff stated that Mr. Weis had "no known

history of psychiatric problems or symptoms that would preclude Administrative

Segregation for inappropriate behavior."

4824-7270-6479.1

53.     Within weeks of arriving at the Prison, Mr. Weis told staff that he was hearing voices telling him to do things to himself and he threatened to kill himself. Shortly thereafter, Mr. Weis was disciplined for smearing feces on himself, but a Prison therapist concluded that the conduct was not the result of a serious mental illness.  A little more than a month later, Mr. Weis was disciplined for banging his head against the wall and spreading feces on himself.  In response, Prison mental health staff authorized placing Mr. Weis in solitary confinement and authorized the use of a behavior management plan.  During his seven months at the Prison, Mr. Weis met with the Prison psychiatrist just once, more than four months after his arrival.

54.     Seven months after arriving at the Prison, Mr. Weis was found dead in his cell as a result of hanging.

**Marty Hayworth**

55.     Marty Hayworth was diagnosed with multiple serious mental illnesses before arriving at the Prison, including schizophrenia.  Mr. Hayworth hears the voice of a dog named Gene who directs him to harm himself.  Mr. Hayworth has repeatedly attempted to take out his own eyes.

56.     Despite his previous diagnoses of serious mental illness, Prison staff have refused to acknowledge that Mr. Hayworth is mentally ill.   Prison mental health staff have described Mr. Hayworth's attempts to take his own eyes out and

18

swallow objects as "manipulative" and "characterological," rather than symptoms of mental illness.

57.     In 2012, the Prison psychiatrist diagnosed Mr. Hayworth as malingering (*i.e.* faking) mental illness.  The psychiatrist also discontinued all of Mr. Hayworth's medications without meeting with him or investigating possible reasons for noncompliance.  Mr. Hayworth's stated reason for refusing to take his medications was "the outerspace people and Gods and I don't need any mental health medication."  Subsequently, Mr. Hayworth received approximately 40 disciplinary violations, which Prison custody staff attributed to "medication noncompliance."

58.     Prison mental health staff have repeatedly approved standard disciplinary measures for Mr. Hayworth's behavior for many years.  Since 2005, Mr. Hayworth has spent years in solitary confinement at the Prison.  He reports feeling like a "young kid locked up in a closet" when he is in solitary.  He spreads feces in his cell to "keep bad spirits away," and engages in self-harm.  He has been repeatedly disciplined and restrained for self-harm and behavior such as smearing feces, drinking Ajax, and swallowing glass.

59.     In April 2015, Mr. Hayworth contacted DRM to tell them that he believed Prison staff were constructing a cross on which to crucify him.

60.     Since 2015, Mr. Hayworth has continued to spend the vast majority of his time in locked housing and subject to behavior management plans.

61.     In 2017, Mr. Hayworth repeatedly requested to be placed in the Mental Health Treatment Unit, but those request were denied based on lack of bed space and new security procedures implemented for the unit.

62.     In April 2018, a mental health consultant concluded that Mr. Hayworth "has no known history of psychiatric problems or symptoms that would preclude a locked housing assignment for inappropriate behavior."

63.     Contrary to the above conclusion, later that same month, a doctor reported that Mr. Hayworth "has a well-documented [history] of psychotic behaviors and multiple attempts at self-harm via ingesting foreign objects," for which he had undergone multiple surgeries to remove the foreign objects.  The doctor concluded Mr. Hayworth presented a disorganized thought process suggesting a primary psychotic diagnosis.

64.     Despite that assessment, Mr. Hayworth remained in solitary confinement.

65.     In May and June 2018, Mr. Hayworth was observed having conversations with himself, at one point stating to himself:  "Nice try boy.  I got a write-up because you are bugging me."  Mr. Hayworth also reported to mental health staff that God, Jesus, and the Devil told him to refuse his medications.

**Paul Parker**

66.     Paul Parker has long-standing diagnoses of mental illness, including bi-polar disorder, post-traumatic stress disorder, and major depression.  For many years, Mr. Parker has taken lithium for his bi-polar disorder, as well as antidepressants and antipsychotic medications.

67.     Prison staff have repeatedly ignored Mr. Parker's mental illnesses when addressing his behavior and making his housing assignments.  Mr. Parker has spent many years in solitary confinement.  In solitary confinement, Prison mental health staff have observed Mr. Parker decompensating.  After years in solitary confinement, Mr. Parker has expressed concern regarding his ability to reintegrate into the general prison population.

68.     Prison staff have repeatedly placed Mr. Parker in 24-hour isolation on behavior management plans for threatening to slice his throat, threatening to stab himself with pens, biting his arm and wrist and smearing the blood on the floor "to make the situation look worse than it actually was," smearing blood on his cell, and writing a message in blood about wanting to die.

69.     In 2012, mental health staff concluded that Mr. Parker was biting and picking at his arm "for the purpose of manipulating staff and receiving mental health services at his leisure."  They also concluded that his act of smearing blood on walls was "malingering his depression to gain attention."

21

70.     Prison staff have been deliberately indifferent to the harmful effect of solitary confinement on Mr. Parker.  In a 2011 document, Prison staff wrote that they were placing Mr. Parker in solitary confinement with the goals of:  "learn to deal with depression," "learn to refrain from this type of behavior by working on his 'people skills' and thinking before he reacts," and finding ways to "occupy his mind."

71.     After Mr. Parker met with the Prison psychiatrist, the psychiatrist wrote:  "I think most of his complaints were involving being in locked housing but I explained to him that there wasn't anything I could do about that."

72.     In 2012, the Prison psychiatrist concluded that Mr. Parker did not have bi-polar disorder, despite previous diagnoses of that illness.  The psychiatrist then discontinued Mr. Parker's lithium prescription and refused to restart it.

73.     Mr. Parker's mental state seemed to be improving in early 2016. However, during a telepsychiatry visit in April 2016, Mr. Parker stated that he would kill himself if he were ever placed back into maximum security locked housing.

74.     Nevertheless, from 2017 to the present, Mr. Parker spent the majority of his time in locked housing and was placed on at least five behavior management plans.

22

75.    Beginning as early as 2017, Mr. Parker repeatedly requested and was denied regular mental health services in the form of individual therapy.

76.    On February 14, 2018, Mr. Parker submitted a kite requesting assisted suicide, stating that he was "distressed" and "tired of everything."

77.    On February 28, 2018, Mr. Parker once again requested and was denied individual therapy.  Upon the denial, Mr. Parker pointed to old wounds on his forearm and told the mental health provider that, if she did not see him for individual therapy, "this is nothing."  Later that day, Mr. Parker attempted suicide by cutting his wrists and arms down to a vein with a razor blade.

78.    Mr. Parker was subsequently issued a disciplinary infraction for unauthorized possession of a razor blade and placed on a behavior management plan.

79.    Despite Mr. Parker's recent suicidal acts and previous mental illness diagnoses, a Prison mental health consultant concluded on March 20, 2018 that Mr. Parker "has no known history of psychiatric problems or symptoms that would preclude a locked housing assignment for inappropriate behavior."

**Cleveland Boyer**

80.    Cleveland Boyer was 23-years old when he was sent to the Prison in February 2013.  Prior to arriving at the Prison, he had spent two years at Yellowstone County Detention Facility ("Yellowstone"), where medical and

23

mental health staff noted that he suffered from anxiety and depression and prescribed him antidepressants.

81.     In June 2011, Mr. Boyer's mother died in a house fire.  A few days later, he attempted to commit suicide by slashing his neck twice with a razor at Yellowstone.

82.     Upon arriving at the Prison, Mr. Boyer informed medical and mental health staff of his suicide attempt, that he suffered from mental illness, that he believed he had bi-polar disorder and schizophrenia, and that he had been prescribed several medications for his mental illness.  Nevertheless, Prison mental health staff determined that he had "no significant" mental health needs.

83.     The Prison psychiatrist dismissed the seriousness of Mr. Boyer's suicide attempt, writing:  "Boyer reports that he attempted suicide in 2011 by cutting his throat when his mother dies [sic].  However, I actually couldn't even see a scar so it must not have been very serious."

84.     Two months after seeing the psychiatrist and just three months after arriving at the Prison, Prison staff placed Mr. Boyer in solitary confinement for 90 days as a result of rule violations.  Mr. Boyer was released from solitary confinement on August 14, 2013.  Nine days later corrections officers found him dead in his cell.  Medical staff who attempted to resuscitate Mr. Boyer were concerned that he had overdosed on drugs.

24

**Matthew Brandemihl**

85.     Matthew Brandemihl was 32 years old when he was sent to the Prison

from Gallatin County jail on or about May 12, 2014.  Approximately one week

before he was scheduled for transfer to the Prison, Mr. Brandemihl attempted

suicide in his cell by biting a hole in his wrist approximately two inches in

diameter.  Questioned by a police officer at the hospital later that day, Mr.

Brandemihl stated that he believed he was the son of God and has been alive for

one thousand years, and that his brother was the devil and becomes a spirit and

possesses other people's bodies in order to torment him, and tells him to commit

acts of destruction.

86.     Mr. Brandemihl started taking the antidepressant Citalopram to treat

an apparent anxiety disorder approximately three days before this suicide attempt.

87.     According to Prison records, during his clinical intake at the Prison,

Mr. Brandemihl complained that "a device has been drilled into, or implanted into

my head" and appeared "sad" and "depressed."  The nurse who evaluated him,

however, did not recommend a psychiatric evaluation or treatment, psychological

testing, or placement in a mental health group.

88.     On June 20, 2014, Mr. Brandemihl became agitated during a trip to

the infirmary and refused to leave when asked.  When confronted by corrections

officers, Mr. Brandemihl declared that his name was "Jesus" and accused Prison

25

staff of trying to poison his food and water.   The prison investigator recommended discipline for Mr. Brandemihl instead of mental health treatment, concluding that his behavior was "not symptomatic of a mental illness that would prevent knowledge of his actions."  Mr. Brandemihl was sentenced to 11 days in Locked Housing.

89.    In 2014, the Prison psychiatrist concluded that Mr. Brandemihl's behavior and psychotic beliefs were evidence of "just frank malingering and being uncooperative" and the side effects of past substance abuse.  He made no recommendations for mental health treatment or medication for Mr. Brandemihl.

90.    In July 2014, Mr. Brandemihl attempted suicide again by trying to chew through his arm and wrist.  In response, Prison staff placed Mr. Brandemihl in Locked Housing.  In an e-mail dated July 8, 2014, Prison staff wrote, "the mental health department feels [Mr. Brandemihl] knowingly, willingly, and purposely engaged in self-harm behavior and should be held accountable for his actions."

91.    Later that month, Mr. Brandemihl again tried to commit suicide by chewing through his arm and wrist and taking approximately 50 multivitamin tablets.  On that same day, corrections officers observed Mr. Brandemihl drinking out of the toilet in his cell after he had fallen and hit his head on it.  Rather than prescribe mental health treatment for Mr. Brandemihl, Prison officials placed him

4824-7270-6479.1

on a behavior management plan for "hindering" prison staff and once again sent

him to a Locked Housing unit.  Prison records show that the "hindering" charge

was based on the fact that attending to Mr. Brandemihl's suicide attempt "caused

the day to day operations of the unit to fall behind schedule."

92.     Medical records indicate that Mr. Brandemihl informed the medical

professional who treated him at Deer Lodge Hospital following this incident that

he bit his wrists and tried to suck his own blood "out of fear of metals in his

blood."  These records also show that Deer Lodge Hospital recommended that Mr.

Brandemihl receive "psychiatric follow up at the prison."

93.     At his subsequent disciplinary hearing, Mr. Brandemihl was found

guilty of infractions for engaging in self-harm and for obstructing and hindering

prison staff.  He was sentenced to 11 days in Locked Housing.

94.     On August 4, 2014, a doctor treating Mr. Brandemihl observed that he

suffered from "apparent persecutory delusions" and requested that his mental

health be assessed "ASAP."  According to prison records, the only action taken

was to send a "mental health technician" to perform a wellness check on Mr.

Brandemihl.

95.     On September 23, 2014, Mr. Brandemihl was found sleeping in his

cell near a plastic bag filled with blood.  He refused to be handcuffed when

directed by the corrections officers.  Instead, he began flushing objects down the

toilet in his cell.  As a result, he was again transferred to Locked Housing and placed in solitary confinement.

96.     Shortly thereafter, Mr. Brandemihl was found dead in his Locked Housing cell.  Prison records indicate his body was found on the floor "laying in a pool of blood under his blankets."  When prison staff found Mr. Brandemihl's body, they noted the blood on the floor had dried, his skin was cold, and rigor mortis had already begun to set in, all of which indicated he had been dead for several hours.

**Prisoner No. 8**

97.     Prisoner No. 8 is a 34-year-old who has been in and out of prison since 2003.  He was 18 years old when he first entered the State Prison.  His mother reported that he was diagnosed with schizophrenia a year earlier and that there is a family history of schizophrenia.

98.     In September 2012, Prisoner No. 8 was transferred to Crossroads Correctional Center in Shelby, Montana.  During his stay at Crossroads he told staff that a computer chip had been placed in his head.  He was subsequently evaluated, given a diagnosis of schizophrenia, and deemed to be at a long-term, high-risk of suicide.

99.     Prisoner No. 8 was eventually transferred back to the Prison.  In June 2013, a mental health assessment indicated bizarre behavior including talking

28

about cutting a chip out of his head.  Nevertheless, the Prison psychiatrist found that Prisoner No. 8 had a "history of malingering" and rejected the previous diagnosis of schizophrenia.

100.   In November 2015, Prisoner No. 8 had a psychotic episode in his cell in which he began screaming that he was suicidal and was going to be hurt.  On this occasion, and subsequent occasions, clinical therapists noted that Prisoner No. 8 has "an Axis I or II disorder of schizophrenia."

101.   In April 2016, an incident report described Prisoner No. 8 stating that demons were in his cell trying to kill him, and that he wanted to kill officers.  He also paced back and forth in his cell with a pillowcase tied around his neck repeatedly saying "shut up" even though no one was talking.  Neighboring inmates requested to be moved because of the "constant self-conversation and chanting by [Prisoner No. 8]."  Despite this behavior, MSP staff concluded that Prisoner No. 8 Aaron was "organized and purposeful in his behavior and has a history of manipulating to get what he wants and is thus eligible for a behavior management plan."

102.   In November of 2016, Prisoner No. 8 believed that he was being disciplined for symptoms of schizophrenia.  He had not seen a doctor in four months.  His mother reported a month earlier that Prisoner No. 8 had been attempting suicide by trying to chew through his wrist.  He had a silver dollar

29

sized, untreated, wound on his wrist and was preoccupied with suicidal thoughts.

He said he "can't hang himself because the CIA put a rod in his neck."

103.   On February 2, 2017, Prison staff conducted another mental health

emergency interview and noted that Prisoner No. 8 stated that he wanted to kill

himself and staff.  He was talking "really fast, repeating words, and pacing."  He

stated that he planned to hang himself with sheets and had been biting himself.  In

response, Prison staff placed Prisoner No. 8 on a behavior management plan.

104.   At present, Prisoner No. 8 has been housed in solitary confinement for

almost three years.  During that time, he has become progressively less responsive

to his parents and the Disability Rights Montana staff who visit him.

105.   In addition to the prisoners identified above, DRM is aware of other

prisoners currently residing at the Prison who have serious mental illness and who

have spent months or years housed in solitary confinement.

106.   The Defendants are well-aware that the Prison's treatment and care of

prisoners with serious mental illness does not satisfy constitutional requirements.

In its 2003 decision in *Walker v. State*, 2003 MT 134, 316 Mont. 103, 68 P.3d 872

(Mont. 2003), the Montana Supreme Court made it very clear that the Prison has a

constitutional obligation to provide prisoners with appropriate mental health

treatment and to eliminate disciplinary practices that exacerbate prisoners' mental

illnesses.  The Court concluded that the Prison's behavior management plans and

living conditions constitute cruel and unusual punishment when they exacerbate the prisoner's mental health condition.

107.   In 2009, the DOC faced another lawsuit, *Katka v. State*, No. BDV 2009-1163 (1st Jud. Dist. Ct., Lewis and Clark Co.) challenging the Prison's treatment and discipline practices for juveniles with mental illness.  The DOC resolved *Katka* by entering into a 2012 settlement agreement requiring the Prison to implement changes regarding its housing and treatment of prisoners with serious mental illness and treatment of suicidal prisoners.  Throughout discovery in that case, Prison officials heard from mental health experts addressing the deficiencies in the Prison's use of solitary confinement and inadequate mental health treatment.

108.   In addition, Prisoners with serious mental illness regularly request and grieve the level of mental health care they are provided, including the negative impact of isolation, mental health staff discontinuing their needed medications and mental health staff ignoring previous diagnoses.  In 2012 alone, a Prison staff member publicly stated that mental health staff answered over 2,000 mental health requests.  Several prisoners have appealed the inadequacy of the mental health treatment they receive to the Prison Warden and ultimately to the DOC Director.

109.   In addition, DRM has repeatedly informed Prison officials of the serious deficiencies in the Prison's treatment of prisoners with serious mental illness.

110.   On February 26, 2014, DRM sent then-DOC Director Mike Batista a letter describing many of the facts alleged in this Amended Complaint.

111.   Given their knowledge of these practices, and their knowledge of the serious harm that can be caused by these practices, the DOC Defendants have been deliberately indifferent to the serious medical needs of prisoners with serious mental illness at the Montana State Prison.

**PRAYER FOR RELIEF**

Wherefore, plaintiff Disability Rights Montana, Inc. prays that this Court:

A.   Issue declaratory judgment that the DOC Defendants' acts violate the Eighth Amendment to the U.S. Constitution, and that these acts and omissions continue to cause an ongoing risk of the violation of those rights;

B.   Issue injunctive relief to stop the constitutional violations described above, including injunctive relief that:

1.   Requires the DOC Defendants to take immediate steps to ensure that individuals with serious mental illness incarcerated at the Montana State Prison receive constitutionally adequate mental health care;

2.   Enjoins the DOC Defendants from placing prisoners with serious mental illness in solitary confinement;

32

C.    Retain jurisdiction over this case until the DOC Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that the DOC Defendants will continue to comply in the future absent continuing jurisdiction;

D.    Award reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205; and

E.    Order all other relief the Court deems appropriate.

Respectfully submitted this 23rd day of December, 2019.

*s/Jeffrey A. Simmons*
Jeffrey A. Simmons
Foley & Lardner LLP
150 East Gilman Street
Madison, WI  53703-1482
Telephone:  (608) 258-4267
Email:  jsimmons@foley.com

Alex Rate
ACLU of Montana
P.O. Box 1968
Missoula, MT  59806
Telephone:  (406) 204-0287
Email:  ratea@aclumontana.org

Kyle A. Gray
Holland & Hart LLP
401 N. 31st Street, Suite 1500
Billings, MT  59101-1277
Telephone:  (406) 252-2166
Email:  kgray@hollandandhart.com

4824-7270-6479.1

Roberta Zenker
Disability Rights Montana, Inc.
1022 Chestnut Street
Helena, MT  59601-0820
Telephone:  (406) 449-2344
Email:  roberta@disabilityrightsmt.org

*Attorneys for Plaintiff Disability Rights Montana, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2019, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served vie electronic filing upon all counsel of record in this case. I also certify that a copy of the foregoing was sent via email to:

**William L. Crowley**
**Natasha Prinzing Jones**
**Thomas J. Leonard**
BOONE KARLBERG, P.C.
201 West Main Street, Suite 300
PO Box 9199
Missoula, MT 59807-9199
Email:bcrowley@boonekarlberg.com
npjones@boonekarlberg.com
tleonard@boonekarlberg.com

**Colleen E. Ambrose**
MONTANA DEPARTMENT OF CORRECTIONS
P. O. Box 201301
Helena, MT 59620-1301
Email: cambrose@mt.gov

*s/Jeffrey A. Simmons*
Jeffrey A. Simmons
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703-1482
Telephone: (608) 258-4267
Email: jsimmons@foley.com