William L. Crowley
Thomas J. Leonard
Natasha Prinzing Jones
Christopher L. Decker
BOONE KARLBERG P.C.
201 West Main, Suite 300
P.O. Box 9199
Missoula, MT 59807-9199
Telephone: (406)543-6646
Facsimile: (406) 549-6804
bcrowley@boonekarlberg.com
tleonard@boonekarlberg.com
npjones@boonekarlberg.com
cdecker@boonekarlberg.com

Colleen E. Ambrose
Special Assistant Attorney General
Department of Corrections
5 South Last Chance Gulch
P.O. Box 201301
Helena, MT 59620
Telephone: (406) 444-4152
Facsimile: (406) 444-4920
cambrose@mt.gov

*Attorneys for Defendants Brian G. Gootkin
and Jim Salmonsen*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| DISABILITY RIGHTS MONTANA, INC., <br><br> Plaintiff, <br><br> v. <br><br> BRIAN M. GOOTKIN, in his official capacity as Director of the Montana Department of Corrections, and JIM SALMONSEN, in his official capacity as warden of Montana State Prison, <br><br> Defendants. | Cause No. 2-15-cv-00022-DWM <br><br> **DEFENDANTS' BRIEF IN SUPPOPRT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  DRM HAS FAILED TO IDENTIFY A POLICY OR PRACTICE
    THAT DENIES OFFENDERS WITH SERIOUS MENTAL
    ILLNESS THE MINIMAL CIVILIZED MEASURE OF LIFE'S
    NECESSITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  "[P]lacing prisoners with serious mental illness in various
        forms of solitary confinement for 22 to 24 hours per day
        for months and years at a time." . . . . . . . . . . . . . . . . . . . . . .5

    B.  "[P]lacing prisoners with serious mental illness on behavior
        management plans that involve solitary confinement and
        extreme restrictions of privileges." . . . . . . . . . . . . . . . . . . . .10

    C.  "[H]aving no standards for determining whether placing a
        prisoner with serious mental illness in solitary confinement
        or on a behavior management plan will be harmful to the
        prisoner's mental health." . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.  "[E]ngaging in a pattern of refusing to properly diagnose
        prisoners as suffering from serious mental illness." . . . . . . . . . . 17

    E.  "[F]ailing to have a system in place to review and evaluate
        the diagnosing and prescribing practices of its mental
        health staff." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    F.  "[F]ailing to have a system to classify prisoners according
        to their mental health needs." . . . . . . . . . . . . . . . . . . . . . . . . 19

i

G.     **"[F]ailing to adequately consider prisoners' serious mental illnesses when making decisions about prisoners' housing and custody levels." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20**

H.     **"[H]aving no system in place for auditing, evaluating or ensuring the effectiveness of its mental health care program in treating prisoners with serious mental illness." . . . . . . . . . . . 22**

I.     **Mental Health Staffing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23**

J.     **Suicide Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25**

II.     **THERE IS NO EVIDENCE OF DELIBERATE INDIFFERENCE. . . 27**

A.     **DRM's 2014 Pre-Suit Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . 28**

B.     **Denying Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30**

C.     **Approving Treatment by APRN David Jansch . . . . . . . . . . . . . 30**

D.     **Prior Lawsuits – *Walker* and *Katka* . . . . . . . . . . . . . . . . . . . . . 31**

E.     **Isolation's Effect on Mental Health . . . . . . . . . . . . . . . . . . . . . 33**

F.     **Safe Cells . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34**

G.     **Mental Health Staffing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35**

III.     **THERE IS NO VALID REQUEST FOR INJUNCTIVE RELIEF. . . 36**

**CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40**

**CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42**

# TABLE OF AUTHORITIES

Page

Cases

*Bd. of the Cnty. Comm'rs v. Brown,*
    520 U.S. 397 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Bell v. Wolfish,*
    441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Benjamin v. Jacobson,*
    172 F.3d 144 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36-37

*Boese v. Slaughter,*
    No. CV 05-28-GF-SEH-RKS, 2007 U.S. Dist. LEXIS 103176
    (D. Mont. Mar. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Coleman v. Brown,*
    28 F. Supp. 3d 1068 (E.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*Conn v. City of Reno,*
    591 F.3d 1081 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

*Disability Rights Mont., Inc. v. Batista,*
    930 F.3d 1090 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4, 27

*Farmer v. Brennan,*
    511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28, 33

*Foster v. Runnels,*
    554 F.3d 807 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ga. Advocacy Office of Jackson,*
    4 F.4th 1200 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

*Gibson v. County of Washoe,*
    290 F.3d 1175 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*Gillette v. Delmore,*
    979 F.2d 1341 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Gilmore v. Cal.,*
    220 F.3d 987 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Harrelson v. Dupnik,*
    970 F. Supp. 2d 953 (D. Ariz. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Oracle Corp. Sec. Litig.,*
    627 F.3d 376 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Jett v. Penner,*
    439 F.3d 1091 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Johnson v. Lewis,*
    217 F.3d 726 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Katka v. State,*
    No. ADV 2009-1163 (First Jud. Dist. Court, Lewis & Clark Cnty.) . . . . . .32

*L.A. v. Lyons,*
    461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Morgan v. Morgensen,*
    465 F.3d 1041 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27

*Simmons v. Cook,*
    154 F.3d 805 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Tischler v. Billings Women's Prison,*
    Cause No. CV-07-173-BLG-RFC-CSO, 2008 U.S. Dist. LEXIS 118729
    (D. Mont. Mar. 24, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Tischler v. Billings Women's Prison,*
    Cause No. CV-07-173-BLG-RFC-CSO, 2008 U.S. Dist. LEXIS 41702
    (D. Mont. May 27, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Toguchi v. Chung,*
    391 F.3d 1051 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

*Turner v. Safley,*
    482 U.S. 78 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Walker v. State,*
    68 P.3d 872 (Mont. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Welsh v. Correct Care, LLC,*
    2020 U.S. Dist. LEXIS 30358 (N.D. Tex. Jan. 30, 2020) . . . . . . . . . . . . 38

*Wilson v. Seiter,*
    501 U.S. 294 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Statutes

Mont. Code Ann. § 53-30-701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Mont. Code Ann. § 53-30-702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

18 U.S.C. § 3626 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Rules

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**INTRODUCTION**

Over seven years ago, Plaintiff Disability Rights Montana, Inc. (DRM) filed this lawsuit under 42 U.S.C. § 1983, claiming certain policies and procedures at the Montana State Prison (MSP) violate the Eighth Amendment rights of offenders with serious mental illness. Since that time, sweeping changes have been implemented at MSP. Most notably, Defendants worked with the Montana Legislature and former Governor Bullock to pass House Bill 763 in 2019. That legislation, now codified as Mont. Code Ann. § 53-30-701, *et seq.*, governs the use of "restrictive housing" at MSP. The legislation imposes substantial limitations on the use of restrictive housing generally, and on offenders with mental illness specifically. MSP's hard work in improving procedures relative to restrictive housing and managing mentally ill offenders has also been recognized by the National Commission on Correctional Health Care ("NCCHC"). In its August 2021 review and accreditation of MSP, the NCCHC found that all of its standards for "Mental Health Services" and "Segregated Inmates" were "fully met."

To the extent DRM's allegations had merit in 2014 (and they did not), almost nothing remains of the alleged policies and practices that were once the subject of its complaint. Rather than dismiss its lawsuit or seek compromise, however, DRM has continued to litigate. At the same time, it has largely refused to specify the alleged constitutional deficiencies that remain at issue, or the

1

particular injunctive relief it is seeking. This is telling. The undisputed facts prove DRM is unable to satisfy the elements of its Eighth Amendment claim. Moreover, DRM's request for injunctive relief is too vague and factually overbroad to be granted, even assuming a genuine issue remained as to an ongoing Eighth Amendment violation. Defendants' Motion for Summary Judgment should be granted.

## BACKGROUND

A thorough recitation of the material facts is set forth in Defendants' Statement of Undisputed Facts ("SUF"), filed contemporaneously herewith. The material facts are also summarized in the following discussion.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The non-moving party must come forth with evidence which creates a genuine issue of triable fact. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). DRM cannot sustain its burden here.

## ANALYSIS

DRM's sole claim alleges ongoing violations of the Eighth Amendment's guarantee against cruel and unusual punishment. It seeks an injunction requiring that "individuals with serious mental illness incarcerated at the Montana State

Prison receive constitutionally adequate mental health care" and that Defendants be directed to stop "placing prisoners with serious mental illness in solitary confinement." (Doc. 49 at 32.)

An Eighth Amendment violation is comprised of both an objective and a subjective component. *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019). The objective component turns on whether the alleged deprivations are "sufficiently serious" to constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To satisfy this requirement, "a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

The subjective component requires a finding that the defendants have a "sufficiently culpable state of mind." *Id.* This requires the court "to assess whether the conduct at issue is 'wanton.'" *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1075-76 (E.D. Cal. 2014). Here, DRM is unable to satisfy either prong of the Eighth Amendment analysis, and is also unable to state an actionable claim for injunctive relief.

## I. DRM HAS FAILED TO IDENTIFY A POLICY OR PRACTICE THAT DENIES OFFENDERS WITH SERIOUS MENTAL ILLNESS THE MINIMAL CIVILIZED MEASURE OF LIFE'S NECESSITIES.

The Eighth Amendment protects prisoners from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). "[R]outine discomfort inherent in the prison setting" does not rise to the level of a constitutional violation. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Only extreme deprivations which deny the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment claim. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In a case seeking prospective injunctive relief, only those policies and practices currently in place and which present a substantial and ongoing risk of significant harm are relevant. *E.g., L.A. v. Lyons*, 461 U.S. 95, 102 (1983); *Farmer*, 511 U.S. at 846. To prevail, DRM must identify a policy or procedure in effect at MSP today that poses a substantial risk to offenders who are seriously mentally ill of "significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

As the Ninth Circuit noted in this case, DRM "isolates nine prison practices and/or policies that DRM contends are constitutionally suspect." *Disability Rights Mont.*, 930 F.3d at 1094. In the complaint filed after remand, DRM dropped one of these. (SUF 66.) In discovery, DRM has attempted to broaden the scope of its

4

complaint by also alleging inadequate mental health staffing and problems with MSP's suicide prevention practices.  (SUF 68, 263.)

The undisputed facts prove DRM's characterizations of MSP procedures are dated, at best.  None of the procedures in place today impose a risk of denying offenders—including offenders with a severe mental illness—the minimal civilized measure of life's necessities.

### A. "[P]lacing prisoners with serious mental illness in various forms of solitary confinement for 22 to 24 hours per day for months and years at a time."

Since Montana's restrictive housing legislation went into effect on January 1, 2020, offenders with severe mental illness (SMI) are generally not placed in restrictive housing, much less "solitary confinement."  (SUF 70, 77.)  Restrictive housing is defined in Montana law, consistent with the definition used by the American Correctional Association (ACA) and other organizations, as:

> A placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility.  The term includes administrative segregation, protective custody, and disciplinary detention if the conditions of confinement require inmates to be confined to a cell for at least 22 hours a day.

Mont. Code Ann. § 53-30-702(12).

As a general rule, SMI offenders who require more secure housing are placed on designated mental health blocks in MSP's Secure Adjustment Unit (SAU), not the Restricted Housing Unit (RHU).  (SUF 71.)  These offenders

5

generally receive a minimum of 4 hours outside of their cells, 7 days a week, and thus are not in restrictive housing. (SUF 42, 73.) In fact, 4 hours out-of-cell is the same amount of time DRM identified as constitutionally adequate in its discovery responses. (SUF 328.) These offenders are on individualized plans, are not required to progress through other levels of the administrative segregation step-down program, and are eligible for immediate transfer back to general population at any time their level of functioning supports the placement. (SUF 36, 42, 72.)

On those rare occasions when safety and security concerns require that an SMI offender be placed in restrictive housing, the placement is short (generally capped at 14 days), and requires assessment and approval of a Qualified Mental Health Professional (QMHP). (SUF 74.)

The use of restrictive housing and the duration of stays in restrictive housing have decreased significantly since January 1, 2020, even as it relates to the prison population generally. Offenders progress quickly through the levels of the new administrative segregation step-down program and return to general population. (SUF 39, 77.) Data demonstrates that MSP's RHU generally runs at 50-60% of its bed capacity, meaning less than 3% of MSP inmates are in restrictive housing at any given time. (SUF 77.) Furthermore, the average length of stay in restrictive housing for all inmates since January 1, 2020, is 20.9 days—hardly "months and years." (SUF 78.)

6

During its August 2021 accreditation review, the NCCHC determined its standards for "Restraint and Seclusion" and "Segregated Inmates" were "fully met" by MSP. (SUF 69.)

In contrast to "restrictive housing," which has a statutorily defined meaning in Montana, "solitary confinement" is not defined by Montana law, by DRM, by DOC policy or by MSP procedure. (SUF 79.) That said, "solitary confinement" is generally considered to be a form of extreme isolation that deprives the offender of meaningful human interaction. (SUF 80.) Restrictive housing at MSP does not qualify as "solitary confinement" because offenders have full visiting privileges (albeit no contact visiting) as well as frequent meaningful contact with staff and other offenders every day. (SUF 81, 82.)

As it relates to interactions with staff, every offender in restrictive housing (and every offender in SAU) is checked on by security staff every 30 minutes on an irregular schedule, amounting to approximately 48 security checks per day. (SUF 83-86.) During waking hours, these security checks often involve conversations between the offender and staff. (SUF 87.) Security staff also interact with offenders to facilitate showers, escorts to exercise periods, serving meals, clothing exchange, sick call, haircuts, and other tasks. (SUF 88.)

In addition to these interactions with security staff, offenders in restrictive housing receive visits and interact at least once every day with each of the following:

1. a mental health technician (correctional officers with special mental health training);

2. a qualified health care professional; and

3. the shift supervisor or supervisor in charge.

(SUF 90, 91.)

Each offender in restrictive housing is also seen face-to-face by a QMHP at least three times per week—once by a mental health therapist and twice by a psychiatric RN. (SUF 92.) Each contact is documented and contains, at a minimum, a status report and the date and time of the contact. (SUF 92.)

Also, hearing officers, grievance and education staff visit the blocks and interact with the inmates in keeping with their responsibilities and when requested. (SUF 94.) All rounds by staff are documented on the Guard 1 electronic scanning system as well as the round books. (SUF 95.)

MSP procedure explicitly provides that conversations between staff and offenders in restrictive housing are to take place within the same parameters as general population. (SUF 96.) Defendant's expert witness, James Upchurch, "noted during the tour of the facility that the majority of the staff and the assigned inmates knew each other and were very accustomed to frequent contact,

acknowledging one another in a cordial manner, and openly discussing issues and concerns that they might have." (SUF 100.)

In addition to visiting privileges and multiple interactions with staff every day, offenders in RHU are allowed to, and do, interact with each other on a daily basis. They communicate with one another throughout the day from cell to cell and also during their two hours of recreation time. (SUF 103.) All offenders in restrictive housing (except for those in a very brief pre-hearing confinement period), are permitted two hours per day of exercise area access, seven days a week, which is in addition to day room time out of cell. (SUF 104.) During this recreation time, offenders are allowed to talk freely and socialize. (SUF 104.)

Offenders in restrictive housing also continue to receive access to a full complement of mental health services, including individual therapy, group therapy, and psychotropic medication management. (SUF 274, 275.) In this regard, the NCCHC determined in its August 2021 accreditation review that all standards for "Mental Health Services," "Information on Health Services," "Access to Care" and "Grievance Process for Health Care Complaints" were "fully met" by MSP. (SUF 264, 270.)

Offenders are also issued a computer tablet for use every other day to increase access to education, training and other resources. (SUF 106, 280.) Mental health also administers therapeutic tools, such as radios, MP3 players,

cards, DBT cards, journals, and coloring materials according to each offender's individual treatment plan. (SUF 281.) Recreation and hobby programs are also provided to inmates in restrictive housing, and there is a full-time Recreation Therapist at MSP who works with mentally ill inmates, including those who are SMI. (SUF 279.)

DRM's allegations regarding restrictive housing simply have no basis in fact. Presumably for this reason, DRM's focus has now shifted to a rare kind of short-term placement used primarily for actively suicidal offenders, called a Security Management Plan (SMP), discussed more fully below.

## B. "[P]lacing prisoners with serious mental illness on behavior management plans that involve solitary confinement and extreme restrictions of privileges."

MSP no longer uses Behavior Management Plans (BMPs) under any circumstances, for SMI offenders or otherwise. (SUF 119.) BMPs were discontinued at MSP in 2019 and the written procedure allowing BMPs was formally rescinded. (SUF 120.)

In the past, BMPs were used to manage an offender's repeated dangerous and/or assaultive behavior by withholding an offender's personal items and/or privileges and returning them when the offender demonstrated he was able to meet the objectives of the plan. (SUF 121.) BMP clearance by a mental health

professional could be given for 6 months and the BMP could be implemented for a broad range of behaviors.  (SUF 122.)

Rather than drop this part of its case, DRM contends BMPs have simply been "relabeled" as SMPs.  The undisputed facts show SMPs are radically different from BMPs.  An SMP is an emergent security-based response to behavior that presents an imminent danger of harm toward self or others.  (SUF 124.)  Most frequently, SMPs are administered to ensure the immediate safety of a suicidal or self-harming offender until he can be evaluated and moved.  (SUF 125.)  Unlike BMPs, use of SMPs is rare, very short, and tailored to protect the offender and the institution from the offender's specific behaviors.  (SUF 126.)

Since January 1, 2020, 27 SMI inmates have been placed on an SMP.  (SUF 128.)  The average length of an SMP was just <u>1.53</u> days.  (SUF 130.)  Despite DRM's suggestion that all SMPs occur in a safe cell, only a portion do.  (SUF 129, 138.)  Offenders on an SMP may remain in their usual housing, may be moved to one of the two observation cells in the infirmary, or may be moved to one of three safe cells located in SAU or RHU.  (SUF 138.)

Any offender placed on an SMP must be assessed within 24 hours by a QMHP.  (SUF 134.)  If the SMP continues longer than a 24-hour period, both a QMHP and the Unit Sergeant must assesses the offender every 24 hours until

11

removed from the SMP. (SUF 135.) If the SMP is extended, a detailed report documenting the justification must be completed. (SUF 136.)

If an SMP reaches 72 hours, a multidisciplinary team reviews the SMP to determine whether to extend it. (SUF 137.) In reality, this is extremely rare. (SUF 126.) Over the past two years, only two inmates have been placed in a safe cell for more than 72 hours. (SUF 131.) One was kept on the SMP for an additional 24 hours. (SUF 132.) The other was kept an additional 48 hours. (SUF 132.)

One-on-one supervision is required when an offender is placed in a safe cell or observation cell. (SUF 139.) This is accomplished by a staff member sitting at the door and/or by electronic means (i.e. camera). (SUF 140.) In the latter case, physical cell door checks also occur every 15 minutes. (SUF 141.) Offenders placed in a safe cell generally do not receive out of cell time for the short period of time they are there. (SUF 155.)

The safe cells' conditions appear to have become DRM's primary focus in this lawsuit. The three safe cells are specifically designed to protect offenders and limit items that could be used by the offender to harm himself or others. (SUF 142, 143.) They serve their purpose well, as no suicide—or death—has ever taken place in a safe cell. (SUF 144.) Ironically, if MSP took lesser measures to ensure the immediate safety of actively suicidal inmates, DRM would surely argue (as it

has in this case), that MSP is not doing enough to prevent suicides. Again, the three safe cells are used rarely and, when they are used, they serve as a very temporary type of holding cell, not a housing placement. (SUF 155.)

Given their primary purpose to essentially eliminate risk of suicide, the safe cells do not have the standard cell bed or combination sink and toilet, though every inmate is provided with a security mattress and blanket. (SUF 147.) For the same reason, the safe cells do not have seated toilets—the toilets are "squat style toilets" located in the floor. (SUF 148.)

DRM insists the squat toilets are inhumane. However, seated toilets and sinks have been dismantled and used at MSP for self-harm, including by DRM's example inmates. (SUF 149.) MSP is aware of no information that using a non-seated toilet—something that is in fact common in many other countries—is detrimental to an inmate's mental health. (SUF 150.) The kind of toilet installed in the safe cells is specifically designed for such cells, and is manufactured and sold in the U.S. today as a "stainless steel security detox toilet [that] is typically mounted in the floor in detoxification cells, padded cells, and isolation cells where conventional toilets may present a hazard to inmates." (SUF 151, 152.)

Offenders on an SMP, or in any form of restrictive housing, receive the same meal service as the rest of the prison population. (SUF 153.) "Nutraloaf" or "loaf" is no longer used under any circumstances, and has not been used for

approximately two years.  (SUF 153.)  On rare occasions a "safety diet" may be administered, but only if related directly to the safety of the inmate (such as removing chicken bones to prevent self-harm, for instance).  (SUF 154.)

In sum, the undisputed facts prove SMPs are far from a relabeling of BMPs. As a matter of law, the use of SMPs at MSP does not deny offenders with SMI the minimal civilized nature of life's necessities.

C.  **"[H]aving no standards for determining whether placing a prisoner with serious mental illness in solitary confinement or on a behavior management plan will be harmful to the prisoner's mental health."**

MSP has a number of standards for considering whether placement in restrictive housing or on an SMP is contraindicated by an offender's SMI, spells these standards out in its written procedures, and often removes or diverts SMI offenders from restrictive housing and SMPs based on these standards.  (SUF 156.) One such standard specifically requires that SMI inmates be diverted whenever possible from restrictive housing to a less restrictive environment.  (SUF 157.) Another states that except in emergent circumstances (and then for no longer than 24 hours) no SMI inmate is placed in restrictive housing status unless a QMHP first determines that the inmate presents an immediate and serious danger and there is no reasonable alternative.  (SUF 158.)  Yet another written standard states an SMI offender's stay in restrictive housing is limited to 14 days maximum, unless the multidisciplinary service team determines there is an immediate and present

14

danger to others or the safety of the institution. (SUF 159.) Procedure further provides that if an SMI offender is placed in restrictive housing, there must be an active individualized treatment plan that includes weekly monitoring by mental health staff, treatment as necessary, and steps to facilitate the transition of the inmate back into general population. (SUF 160.)

There are more examples. Upon notification that an inmate has been placed in restrictive housing, a qualified health care professional reviews the inmate's health record to determine whether existing medical or mental health needs contraindicate placement. (SUF 161.) MSP establishes the specific operational procedure for identifying medical and mental health contraindications, and a referral to mental health occurs immediately if the inmate has mental health needs. (SUF 162-165.)

In addition to this initial review by medical staff, a QMHP conducts a review no later than within 24 hours of the inmate's placement, and determines if there are any mental health contraindications. (SUF 166, 167.) A more comprehensive Mental Health Appraisal for Restrictive Housing is then completed within 72 hours. (SUF 169.) Regular reevaluations occur thereafter. (SUF 168.)

MSP written procedure expressly recognizes that "adult inmates whose movements are restricted in restrictive housing units may develop symptoms of acute anxiety or other mental problems," and for this reason mental health

professionals are required to continually monitor each inmate to determine whether he is exhibiting signs of psychological deterioration or other signs or symptoms of failing mental health. (SUF 170.) Daily rounds are conducted by mental health technicians and/or therapists to watch for signs of decompensation. (SUF 171, 173.) Security staff are trained to watch for and recognize signs of decompensation and alert mental health if observed. (SUF 176.) Additionally, as noted, inmates in restrictive housing are seen by a QMHP at least three times per week. (SUF 92, 172.) A QMHP can remove an inmate who is decompensating from restrictive housing and this has in fact occurred on multiple occasions since the restrictive housing legislation went into effect. (SUF 174, 175.)

As it relates to SMPs, SMI is taken into account in a number of ways. First, offenders with SMI are diverted to the least restrictive placement whenever possible. (SUF 70, 157, 181.) Offenders on SMPs are assessed face-to-face by a QMHP every day and the QMHP promptly removes the offender if decompensating. (SUF 181.) Offenders on SMPs are also assessed daily by medical staff. (SUF 182-185.) If the offender is placed in a safe cell or the infirmary for the SMP, one-on-one supervision around the clock is required. (SUF 186.)

In summary, the allegation that MSP has "no standards" for considering SMI in placing offenders in restrictive housing/SMPs is patently false. The standards

16

are in fact rigorous and have resulted in SMI offenders not being placed in restrictive housing, or on SMPs, except on rare occasions that are easily justified by legitimate penological interests of safety and security.

### D. "[E]ngaging in a pattern of refusing to properly diagnose prisoners as suffering from serious mental illness."

This allegation was in DRM's complaint, but it was not addressed by either of DRM's liability experts, nor was it addressed in DRM's recent Motion for Summary Judgment. (SUF 187, 188.) The allegation appears to be directed at some diagnostic opinions rendered by a former psychiatrist who has not worked at MSP for many years. (SUF 189-200.)

To the extent the allegation has not been abandoned, all mental health diagnoses at MSP are made by QMHPs who are duly qualified, licensed and have experience in diagnosing mental illness. (SUF 191.) MSP written procedures provide for appropriate diagnoses, treatment, and follow-up for mental health care needs throughout the period of an inmate's incarceration, including appropriate diagnostic testing and referrals to community practitioners as needed. (SUF 192.) Currently, 1,182 offenders at MSP—roughly 84%— carry a mental health classification. (SUF 196.)

**E.** **"[F]ailing to have a system in place to review and evaluate the diagnosing and prescribing practices of its mental health staff."**

This allegation, too, was not addressed by either of DRM's liability experts or in DRM's recent Motion for Summary Judgment. (SUF 197.) It appears this theory of liability has been abandoned. (SUF 198.)

Regardless, MSP's Continuous Quality Improvement (CQI) program includes a peer review process for clinicians, conducted through chart review, in-depth case reviews for cases that present ongoing treatment challenges, and a number of written policies are in place to ensure mental health medications are clinically appropriate and provided in a timely, safe and efficient manner. (SUF 201, 203, 204.) MSP also undergoes NCCHC accreditation which requires a variety of quality assurance activities be conducted regularly. (SUF 202.) The NCCHC determined during its August 2021 accreditation that all standards within "Clinical Performance Enhancement," "Pharmaceutical Operations," "Medication Services" and "Medication Administration Training" were "fully met" by MSP. (SUF 199.)

**F. "[F]ailing to have a system to classify prisoners according to their mental health needs."**

Although this allegation was made in DRM's complaint, it too was not addressed by either of DRM's liability experts or in DRM's recent motion. (SUF 205.)[1] It appears this theory has been abandoned. (SUF 207.)

DOC has a "Mental Health and Severe Mental Health Classification" policy which sets forth the procedure for classifying the mental health status and needs of offenders. (SUF 208, 209.) The policy defines MSP's Mental Health Level (MHL) Classification System. (SUF 208, 209.) A QMHP determines the MHL and SMI status of each offender during intake and regularly reassesses the classification, including at every clinical interaction. (SUF 210.) The QMHP uses a structured approach (the Severe Mental Illness Determination form) during these assessments. (SUF 211.)

The MHL is a five-level system, MH-0 to MH-4, ranging from "no evidence of mental health needs" (MH-0) to "severe impairment" (MH-4). (SUF 212.) MH-2, 3 or 4 offenders may also be further classified as SMI. (SUF 213-215, 217.) Criteria supporting an SMI classification is outlined in the policy and by statute, and an inmate whose is considered SMI has the modifier "S" placed before

_____

[1] Dr. Burns did note that the current classification procedure had not been finalized and published on the DOC website as of the date of her report, but this has since occurred. (SUF 206.)

the MHL number.  (SUF 217, 218.)  SMI is defined broadly in DOC policy and in the restrictive housing statutes.  Mont. Code Ann. § 53-30-702(13).

Currently, 1,182 offenders at MSP carry a mental health classification of MH-1 or higher, 412 carry a classification of MH-2 or higher, and 46 inmates are designated as SMI.  (SUF 195, 195, 219-222.)

### G.  "[F]ailing to adequately consider prisoners' serious mental illnesses when making decisions about prisoners' housing and custody levels."

MSP has an Inmate Classification System to review and manage offenders at the appropriate custody, security and supervision levels.  (SUF 223.)  SMI is considered in multiple ways.  (SUF 223.)

Initially, during the intake process, an offender's mental health is assessed during the receiving screening, which is completed within 24 hours.  (SUF 224, 226-231.)  Significant mental status concerns trigger an urgent referral to a QMHP.  (SUF 232.)  The NCCHC determined in its August 2021 accreditation review that all standards for "Receiving Screening," including mental health screening, were "fully met" by MSP.  (SUF 225.)

In addition to the receiving screening, there is a more comprehensive two-phased mental health screening.  (SUF 233.)  The NCCHC determined in its August 2021 accreditation review that all standards for "Mental Health Screening and Evaluation," were "fully met."  (SUF 234.)

A Level 1 Initial Mental Health Screening is done by a QMHP or mental health staff as soon as possible but no later than 14 days after admission. (SUF 235.) A Level 1 assessment consists of a structured interview reviewing the individual's psychiatric and substance use history, the completion of a risk assessment, assessing for victimization, intellectual impairment, trauma history, suicidal ideation and history of sex offenses. (SUF 236, 237.)

Any inmate with a positive Level 1 screening is referred to a QMHP for a Level 2 screening, which must occur within 30 days or sooner if warranted. (SUF 238, 239.) A QMHP then determines what level of mental health classification is appropriate and whether the inmate suffers from SMI. (SUF 240-243.) A case summary report is completed on each inmate that includes mental health information and a summary of any psychological evaluations, along with discussion of many other aspects of the inmate's status and functioning. (SUF 247.) The QMHP's determination of MHL and SMI status is reassessed regularly (at least annually) consistent with NCCHC standards. (SUF 244.)

The offender's MHL and SMI status is entered into the information management system (OMIS) and the offender's medical record at MSP. (SUF 245.) The MHL provides information about inmates who have special treatment needs or who may present special management needs by reflecting their current mental status and needs, rather than just a history of treatment. (SUF 246.)

MSP has a Multi-Disciplinary Team (MDT) consisting of the Warden or designee, a QMHP, the Unit manager or designee and the Associate Warden of Technical Services who provide classification oversight and take into account each inmate's MHL and mental health needs. (SUF 249.) They also review any classification issues presented by the Unit Management Team. (SUF 249.) MSP's consideration of SMI is also reflected in the existence of specialized housing blocks in SAU and High Side Unit 2 for the mentally ill. (SUF 248.)

## H. "[H]aving no system in place for auditing, evaluating or ensuring the effectiveness of its mental health care program in treating prisoners with serious mental illness."

Although this allegation was made in DRM's complaint, it was not addressed by either of DRM's liability experts or in DRM's recent motion. (SUF 250.) Again, it appears this theory of liability has been abandoned. (SUF 251.) And correctly so.

MSP has several systems in place for auditing, evaluating, and ensuring the effectiveness of its mental health care system. (SUF 253.) In its August 2021 accreditation review, the NCCHC determined all of its standards for "Continuous Quality Improvement Program," "Clinical Performance Enhancement" and "Continuity, Coordination, and Quality of Care During Incarceration" were "fully met" at MSP. (SUF 252.)

The DOC has a Quality Assurance Office that coordinates and conducts audits to determine compliance and assures action plans are developed. (SUF 254.) Policy specifically addresses monitoring mental health care delivery through CQI activities that include monthly monitoring, sentinel events and data review. (SUF 255.) For example, a multidisciplinary Continuous Quality Improvement Committee, which includes mental health staff, meets quarterly to identify, design, analyze, and monitor CQI activities. (SUF 256.) At these meetings, record reviews are conducted and attention is paid to accessibility, clinical decision making, continuity of care, timeliness, effectiveness, efficiency, outcomes, and safety. (SUF 257-260.)

Quality assurance has also been substantially improved by recent changes at MSP. An electronic medical record was implemented on October 26, 2021 that combines the separate medical and mental health records that previously existed in paper form. (SUF 261.) This facilitates the ability to collect and review data. (SUF 261.) The hiring of a full time Compliance Manager and the installation of the Guard1 system to electronically collect data in RHU and SAU have also enhanced the CQI program. (SUF 262.)

## I. Mental Health Staffing

Inadequate mental health staffing was not an issue raised in the complaint. (Doc. 49.) It is a new theory of liability asserted only after DRM was forced to

abandon a host of prior allegations. The new theory should not be entertained by the Court, and has no merit regardless.

The undisputed facts prove the current mental health staffing complement is able to provide the mental health services outlined by statute, policy and procedure. (SUF 282.) There are currently a total of 25 mental health staff members at MSP. (SUF 284.) These are supported by 49 regular medical staff members, who provide assistance with medication management, crisis care, chronic care, infirmary level services, and coordination of outside of the institution consults and care. (SUF 282.)

MSP's current mental health staff consists of:

- 3 psychiatrists (one part-time psychiatrist on site, who will soon become full time, and two contracted tele-psychiatrists through Frontier Psychiatry)
- 2 full-time psychiatric advanced practices registered nurses (APRNs)
- 8 full-time mental health therapists (licensed clinical social workers (LCSWs) or licensed clinical professional counselors (LCPCs))
- 1 full-time assistant director of nursing for mental health (a registered nurse (RN) who specializes in mental health)
- 1 full-time psychiatric RN
- 7 full-time mental health technicians (correctional officers with additional mental health training assigned to the mentally ill population)
- 1 full-time discharge planner
- 1 full-time activities therapist
- 1 full-time administrative assistant

(SUF 284.)

The NCCHC closely reviewed MSP's staffing as part of its August 2021 accreditation and, although MSP had fewer mental health staff at the time, the NCCHC determined that all standards relative to "Staffing" of medical and mental health were "fully met." (SUF 283.)

At times in the past, MSP's mental health staffing has been significantly leaner, but even then MSP has been able to provide the required access to mental health services. (SUF 65, 283.) There is no evidence suggesting otherwise. Particularly now with a full number of mental health staff, DRM has no basis to claim MSP's current staffing patterns deny the minimal civilized measure of life's necessities to SMI offenders.

## J.     Suicide Prevention

Inadequate suicide prevention procedures was not an issue raised in the complaint. (Doc. 49.) It is a new theory of liability and should not be entertained by the Court.

Regardless, MSP's procedures certainly satisfy a constitutional minimum. In its August 2021 accreditation, the NCCHC determined all 6 of its standards for "Suicide Prevention and Intervention" were "fully met" by MSP. (SUF 287, 288.)

MSP 4.5.100 Suicide Risk Management sets forth MSP's procedures for identifying and managing suicidal inmates. (SUF 289.) The procedure focuses on reducing risks through training, identification, referral, evaluation and treatment,

housing and monitoring, communication, emergency intervention, reporting, notification, review and stress management. (SUF 290.)

All staff are trained in identification of suicide risk factors, verbal and behavioral cues indicating potential suicide risk, responding to a potentially suicidal inmate, referring an inmate for mental health assessment, intervening in a suicide attempt, and implementing first aid procedures during pre-service training. (SUF 291.) All staff are trained and directed to immediately notify mental health upon identifying suicide risk. (SUF 292.) Consistent with NCCHC standards, staff now utilize the Columbia Suicide Severity Rating Scale as a structured instrument to help better focus their assessments and better quantify risk and changes in risk over time. (SUF 293-295.)

As a general rule, if an inmate is an immediate risk to self or others, he is moved to one of the two observation cells in the infirmary, or one of the three safe cells in RHU and SAU. (SUF 296-298.) Any inmate in an observation cell or safe cell is under constant observation, which may be accomplished by a person sitting at the door or video monitoring. (SUF 299.) In the latter case, physical checks are also conducted every 15 minutes. (SUF 299.)

Over the course of a nine-year period, there have been 11 suicides at MSP. (SUF 307.) Six of the 11 suicides occurred in general population settings, three four occurred in restrictive housing, and one occurred in the SAU in a non-

restrictive housing setting. (SUF 308, 309.) Reviews were conducted in each case which included mortality reviews and externally completed psychological autopsies. (SUF 310.) Over the course of the last 10 years, MSP has revised its suicide prevention policy 5 times as it has become more aware of how to better manage the risk. (SUF 311.)

The fact that suicides have occurred, though tragic and hardly acceptable, does not establish a violation of the Eighth Amendment. DRM has failed to identify any policy or procedure that would even arguably constitute the "unnecessary and wanton infliction of pain" by denying offenders the minimal civilized measure of life's necessities. *Rhodes*, 452 U.S. at 347.

## II. THERE IS NO EVIDENCE OF DELIBERATE INDIFFERENCE.

Even if a genuine issue of material fact existed as to the first element of DRM's Eighth Amendment claim—and it does not—the claim fails the second element. This element "requires that the plaintiff show that a prison official was deliberately indifferent by being 'aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' and 'also draw[ing] the inference.'" *Disability Rights Mont., Inc.*, 930 F.3d at 1097. Deliberate indifference is "a stringent standard of fault," requiring proof that an official "disregarded a known or obvious consequence of his action." *Bd. of the Cnty. Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). Proof of negligence, gross

negligence or medical malpractice is not sufficient. *Farmer*, 511 U.S. at 835-37;

*Toguchi v. Chung*, 391 F.3d 1051, 1060-61 (9th Cir. 2004).

Deliberate indifference is a subjective standard that asks what a defendant's

mental attitude actually was. *Toguchi*, 391 F.3d at 1057. As the Supreme Court

has explained:

> The Eighth Amendment does not outlaw cruel and unusual
> 'conditions'; it outlaws cruel and unusual 'punishments.' An act or
> omission unaccompanied by knowledge of a significant risk of harm
> might well be something society wishes to discourage, and if harm
> does result society might well wish to assure compensation. The
> common law reflects such concerns when it imposes tort liability on a
> purely objective basis. But an official's failure to alleviate a
> significant risk that he should have perceived but did not, while no
> cause for commendation, cannot under our cases be condemned as the
> infliction of punishment.

*Farmer*, 511 U.S. at 837-39 (internal citations omitted).

In discovery, DRM presented three grounds for alleging deliberate

indifference. (SUF 337.) In its recent Motion for Summary Judgment, DRM

presents four additional grounds. (SUF 338.) Each is addressed below. (SUF

339.)

## A.     DRM's 2014 Pre-Suit Letter

When asked for its deliberate indifference theory in discovery, DRM

answered that "DRM sent one of Defendant Goodkin's predecessors, Mike Batista,

a letter on February 26, 2014 detailing the statutory and constitutional violations in

this lawsuit, of which [Gootkin and Salmonsen] and [their] predecessors are likely

aware, and to DRM's knowledge none of the DOC Defendants have taken actions to remedy them." (SUF 340, 341.)

The referenced letter was sent to then Director Batista over 7 years ago, and generally set forth the broad allegations that were later pasted into the original complaint. (SUF 342.) As an initial matter, the letter is not sufficiently specific to provide notice of any ongoing policy or practice that is constitutionally deficient. At best, it provides notice that the use of "solitary confinement" can adversely affect an offender's mental health—a general proposition Defendants have never disputed, and which Defendants' policies and procedures are specifically designed to address.

Furthermore, the letter was inaccurate in 2014, and certainly does not reflect policies or practices at MSP today. The fact that dramatic changes have occurred over the course of the past seven years has been recognized by DRM's own experts. (SUF 343-345.) DRM has also implicitly acknowledged this progress in its decision to abandon a number of theories of liability set forth in the original complaint and in prior discovery responses. (SUF 346.)

Finally, even if the 2014 letter was intended to make MSP leadership aware of DRM's allegation of a risk of harm, this is not sufficient because there is no evidence demonstrating a "conscious, affirmative choice" by a prison official to disregard an ongoing risk of significant harm. *Gibson v. County of Washoe*, 290

29

F.3d 1175, 1187-88 (9th Cir. 2002); *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir.1992).

## B.     Denying Grievances

When asked for its deliberate indifference theory in discovery, DRM answered that "[Defendants Gootkin and Salmonsen] and [their] predecessors have also denied multiple grievances by prisoners complaining about mental health treatment at MSP." (SUF 347, 348.)  MSP does indeed have a grievance process that allows for an appeal to the warden and, in some cases, the director.  (SUF 349, 350.)  The mere fact that grievances are sometimes denied by these officials, however, is insufficient to raise a genuine issue for trial.

There is no evidence of any particular grievance that made Gootkin or Salmonsen aware of an ongoing risk of significant harm to SMI offenders that they then consciously disregarded.  (SUF 351.)  Both Gootkin and Salmonsen have attested they are unaware of any such grievance or risk, and DRM has failed to identify such a grievance or risk, though specifically asked in discovery to do so. (SUF 351.)

## C.     Approving Treatment by APRN David Jansch

When asked for its deliberate indifference theory in discovery, DRM answered that "DRM believes discovery will show that [Defendants Gootkin and Salmonsen] approved improper mental health treatment provided to prisoners with

serious mental illness by David Jansch, APRN, who DRM has reason to believe has exhibited poor bedside manner and has prescribed and/or taken prisoners off medication without the proper medical basis to do so." (SUF 352.) This allegation was not addressed by either of DRM's liability experts or in DRM's recently-filed motion for summary judgment. (SUF 353, 354.)

Regardless, Gootkin and Salmonsen have attested they are unaware of any facts that would lead to the inference that Mr. Jansch exhibited poor bedside manner or did anything without a proper medical basis. (SUF 355.) Furthermore, neither Gootkin, Salmonsen, nor any of their predecessors are medical professionals. (SUF 357, 358.) They are not qualified to interfere with the clinical judgment of a medical professional, and had no reason to believe there was a problem in this regard. (SUF 356.) Even if they were medical professionals, "mere disagreement between a prisoner-patient and prison medical personnel over the need for or course of medical treatment is not a sufficient basis for an Eighth Amendment violation." *Boese v. Slaughter*, No. CV 05-28-GF-SEH-RKS, 2007 U.S. Dist. LEXIS 103176, at *5 (D. Mont. Mar. 5, 2007) (citing *Franklin v. State of Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

### D.     Prior Lawsuits – *Walker* and *Katka*

Although it failed to mention the theory when asked in discovery, DRM has argued in the past, and appears to argue again in its latest motion, that Defendants

are deliberately indifferent because, a number of years ago, the State was sued in two previous lawsuits over "similar practices." (Doc. 74 at 29.) This is incorrect.

*Walker v. State*, 68 P.3d 872 (Mont. 2003) and *Katka v. State*, No. ADV 2009-1163 (First Jud. Dist. Court, Lewis & Clark Cnty.) involved different issues and were both resolved several years ago.

*Walker* was a post-conviction relief proceeding that addressed, in part, MSP's use of BMPs over <u>fifteen years ago</u>. *Walker*, 68 P.3d at ¶ 1. The Montana Supreme Court ordered certain changes to MSP practices and confirmation that the changes had been implemented, *Id.* at ¶ 85, and they were. As discussed, BMPs of any kind are no longer utilized at MSP.

*Katka* involved the use of isolation and BMPs on a juvenile inmate which were far more restrictive than any form of restrictive housing at MSP today. (SUF 362.) Katka received a temporary injunction on the use of such practices pending trial, but "no determination was made by [the] Court that MSP violated any of Katka's statutory or constitutional rights or any prison policy." (SUF 363.) The case was finally resolved in 2012. (SUF 364.)

In sum, there is no evidence Gootkin, Salmonsen, or any other official is aware of a substantial risk of significant harm to SMI offenders by way of the earlier *Walker* or *Katka* lawsuits, much less that they are consciously disregarding that risk. (SUF 365.)

### E.  Isolation's Effect on Mental Health

Defendants are indeed aware that prolonged isolation may pose a risk to mental health.  For this reason, MSP's written procedures and the restrictive housing legislation that Defendants supported are largely based on eliminating this risk.  (SUF 366.)  No evidence is presented that any current policy or practice at MSP presents a substantial ongoing risk of significant harm to SMI offenders which Defendants have consciously chosen to disregard.  (SUF 367.)

DRM has in the past cited the rule that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  However, this exception only applies where there is "evidence of <u>very obvious and blatant circumstances</u> indicating that the prison official knew the risk existed," such that "it is proper to infer that the official must have known [of the risk]." *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2010) (emphasis added); *see also Conn v. City of Reno*, 591 F.3d 1081, 1097 (9th Cir. 2009), *vacated*, 131 S. Ct. 1812 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).  For example, in *Foster* the court found "[t]he risk that an inmate might suffer harm as a result of the repeated denial of meals is obvious." 554 F.3d at 814.  In *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998), the inmates' condition as "paraplegic and wheelchair-bound was obvious and apparent to any layperson," as was the fact that "a wheelchair could not pass through the

33

cell doors and maneuver around the cell bunk to reach the food tray slot and the toilet had no handrails."

Here, "very obvious and blatant circumstances" are missing. Merely claiming Defendants are aware, generally, of risks that may be associated with seriously mentally ill prisoners and isolation is not enough. Indeed, it is well established in the Ninth Circuit that the use of isolation or administrative segregation on mentally ill inmates is <u>not</u> a *per se* violation of the Eighth Amendment. *See, e.g., Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 980 (D. Ariz. 2013) ("Plaintiff has failed to demonstrate the isolation policies applied to juveniles with mental health needs . . . created a risk of harm that was so 'obvious' that ignoring it amounted to deliberate indifference.").

Although research and views on isolation are changing to reflect possible and known risks to the mentally ill, this at most demonstrates this is a complex issue that is under evaluation and is in transition, which is antithetical to the very idea that it is "obvious." Furthermore, MSP's current policies and procedures do not reject the modern trend—they embrace it.

## F.    Safe Cells

Similarly, in its latest motion DRM alleges deliberate indifference is demonstrated by Defendants' general awareness of the use of safe cells. Precisely because Defendants recognize prolonged detention, including in a safe cell, might

detrimentally impact an offender's mental health, MSP procedures regarding the use of safe cells have been substantially revised to guard against this risk. (SUF 373.) As set forth above, safe cells are now used more rarely, only for very short periods of time, and only in emergent situations to secure the safety of the inmate and the institution. (SUF 374.) There is no evidence the current use of safe cells at MSP presents a substantial risk of significant harm to SMI inmates that Defendants are consciously disregarding. (SUF 375.)

### G.   Mental Health Staffing

DRM next alleges Defendants are generally aware of "lean" staffing at MSP and, as such, are deliberately indifferent. This theory fails as well.

First, DRM's allegations regarding inadequate staffing are nowhere to be found in its complaint. (SUF 368.) This new theory of liability should not be entertained.

In any case, the new theory has no merit. Far from deliberate indifference, Defendants have worked hard to achieve a full and increased complement of mental health staff. (SUF 369.) It is uncontroverted that MSP's current contingent of 25 mental health staff, supported by 49 medical staff, is adequate to provide the necessary services outlined above. (SUF 282, 284, 370.) Even when the staffing levels were lower, the NCCHC determined that its standards relative to "Staffing" were "fully met." (SUF 371.) In sum, there is simply no evidence that the current

staffing levels at MSP present a substantial risk of significant harm to SMI inmates which Defendants are consciously disregarding, much less that Defendants deliberately disregarded the risk. (SUF 372.)

## III. THERE IS NO VALID REQUEST FOR INJUNCTIVE RELIEF.

The U.S. Supreme Court has counseled that injunctive relief should only be granted rarely in cases involving the administration of prisons. *Turner v. Safley*, 482 U.S. 78, 85 (1987); *see also, e.g., Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("Judicial deference is accorded not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operations of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.") The Ninth Circuit has likewise recognized that "no more may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum. *Gilmore v. Cal.*, 220 F.3d 987, 998-99 (9th Cir. 2000). In such cases, relief must be narrowly drawn to satisfy the requirements of the law governing equitable relief, as well as the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626 (PLRA).

The PLRA was enacted to expedite prison litigation and, as one circuit justice noted, "to get the federal courts out of the business of running jails." *Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) (en banc) (Calabresi, J.,

concurring). To that end, the PLRA strictly limits the circumstances in which district courts can issue prospective relief in civil actions challenging prison conditions:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A); *see also Tischler v. Billings Women's Prison*, Cause No. CV-07-173- BLG-RFC-CSO, 2008 U.S. Dist. LEXIS 118729 at *4, 5 (D. Mont. Mar. 24, 2008) *report and recommendation adopted*, Cause No. CV-07-173-BLG-RFC-CSO, 2008 U.S. Dist. LEXIS 41702 at *2 (D. Mont. May 27, 2008); *Ga. Advocacy Office v. Jackson*, 4 F.4th 1200 *16 (11th Cir. 2021) ("[T]he PLRA supercharges some of the traditional equitable principles of injunctive relief. . . . While courts were already required to ensure injunctions are no broader than necessary, the PLRA emphasizes the importance of narrow tailoring in prison litigation. . . .")

The fact that injunctive relief in prison cases must be narrowly drawn to correct the specific violation necessarily requires that both the alleged violation and the request for relief be specific. *See id.* "[R]equests for injunctive relief that

are 'factually overbroad' are subject to dismissal." *Welsh v. Correct Care, LLC*, 2020 U.S. Dist. LEXIS 30358, at *41-43 (N.D. Tex. Jan. 30, 2020) (dismissing overbroad claim for injunctive relief because it essentially asked the court to manage the prison's daily operations and "step outside its constitutionally-defined role").

DRM's request for relief is anything but specific. DRM's complaint asks for an injunction requiring that "individuals with serious mental illness incarcerated at the Montana State Prison receive <u>constitutionally adequate mental health care</u>." (Doc. 49 at 32.) It also seeks an injunction to stop "placing prisoners with serious mental illness in <u>solitary confinement</u>." (Doc. 49 at 32.) The complaint does not say what specific changes are required to render MSP's mental health care "adequate," does not define "solitary confinement" or identify any specific changes to MSP's restrictive housing policy. (Doc. 49.)

In discovery, Defendants attempted to learn what specific issues remained to be litigated. They asked DRM to "[p]lease identify the specific injunctive relief now being sought in this action, including the specific changes to policy and procedure you contend are necessary to prevent any Eighth Amendment violations." (SUF 324.) DRM responded with a litany of objections, including that the request "calls for a legal conclusion and for expert testimony." (SUF 325.)

The only substantive response referred back to a prior discovery response in which DRM largely recited the broad allegations in its complaint. (SUF 325.)

DRM stated Defendants should, for instance, provide "adequately sized and adequately staffed housing facilities," "ample recreation and treatment opportunities," and access to group therapy and individual counseling on "a regular basis." (SUF 326.) Defendants pointed out they had already accomplished the general "changes" outlined by DRM, and again asked DRM to specify what any of the remaining deficiencies were. (SUF 327-330.) DRM refused.

DRM similarly responded to Defendants' requests to "identify any specific written policies or procedures" and "any practices now in place at the Montana State Prison which you contend violate the Eighth Amendment." (SUF 331.) Again, DRM responded with objections and simply referred back to older responses. (SUF 332.) Those prior responses, however, contained nothing more than boilerplate objections, a general recitation of the complaint's broad allegations, and a long list of written policies that "may be implicated in these constitutional deficiencies and violations of law." (SUF 333 (emphasis added).) Defendants again asked DRM to specify the alleged deficiencies at issue. DRM refused. (SUF 334.)

DRM's apparent inability to identify the specific changes to policy and procedure that it is seeking in this lawsuit not only presents significant practical

challenges for trial, it provides an additional basis to grant summary judgment. After all, even assuming DRM could establish a constitutional violation, the only relief that could be awarded would necessarily have to satisfy the PLRA. DRM has refused to identify that specific relief, and appears unable to do so.

In sum, even if a genuine issue remained for trial, this case should not devolve into a sprawling review of MSP's operations and mental health services generally. There must be evidence of specific policies or practices that pose a substantial risk of significant harm to SMI inmates, upon which the Court could craft narrowly-drawn relief. There is no such evidence. For this additional reason, summary judgment is warranted.

## CONCLUSION

Rather than work cooperatively with Defendants to continue improving policies and procedures relating to the SMI population at MSP, DRM has chosen to assert Eighth Amendment violations that have no basis in fact or law. The undisputed facts prove:

1. No MSP policy or procedure poses a substantial risk of denying SMI offenders the minimal civilized measure of life's necessities.

2. There is no evidence of a prison official consciously disregarding a substantial risk of serious harm to SMI offenders.

3. There is no evidence of a specific violation that can be remedied with appropriately crafted injunctive relief.

For any one or all of these reasons, Defendants are entitled to judgment as a matter of law. Defendants' Motion for Summary Judgment should be granted.

DATED this 17th day of November, 2021.

/s/ Thomas J. Leonard

Thomas J. Leonard
BOONE KARLBERG P.C.
*Attorneys for Defendants*
*Brian M. Gootkin and Jim Salmonsen*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E), Local Rules of the United States District Court, District of Montana, I hereby certify that the textual portion of the foregoing brief uses a proportionally spaced Times New Roman typeface of 14 points, is double-spaced, and contains approximately 8,997 words, excluding the parts of the brief exempted by L.R.7.1(d)(2)(E).

DATED this 17th day of November, 2021.

/s/ Thomas J. Leonard
Thomas J. Leonard
BOONE KARLBERG P.C.
*Attorneys for Defendants*
*Brian M. Gootkin and Jim Salmonsen*